DECISION AND JUDGMENT ENTRY
{¶ 1} Teresa Large appeals the judgment of the Hocking County Court of Common Pleas, Juvenile Division, granting permanent custody of her children to the Hocking County Children's Services Board ("HCCSB"). Appellant argues that the trial court erred in finding that it is in her sons' best interest for permanent custody to be awarded to HCCSB. However, the record contains overwhelming evidence, including Appellant's own testimony, from which the trial court could clearly and convincingly find that it is in the children's best interest for permanent custody to be awarded to the agency. Because the record contains evidence that Appellant engaged in patterns of stealing, lying, alcohol use and allowing her children to engage in inappropriate activities, we affirm the court's award of permanent custody.
 {¶ 2} After learning that Appellant had held a knife to Jeremy's throat, HCCSB removed Jeremy (d.o.b. 12/7/85) and Steven (d.o.b. 7/7/93) Large from Appellant's home in September of 2000 and placed them in emergency foster care. In December of 2000, the court adjudicated Jeremy an abused child under R.C. 2151.031 and Steven a dependent child under R.C. 2151.04, and granted temporary custody to HCCSB.
 {¶ 3} In March 2002, HCCSB filed motions for permanent custody of Jeremy and Steven. HCCSB alleged that: (1) the boys had been in the temporary custody of HCCSB for at least twelve of the previous twenty-two months; (2) Appellant had not provided child support for the boys or followed through with the reunification plan; (3) the boys' counselor did not believe that reunification with Appellant was in their best interest; (4) there was no indication that Appellant and the boys could reunify in a reasonable time; and (5) it was in the boys' best interest to grant permanent custody to HCCSB and terminate Appellant's parental rights. A magistrate conducted hearings on HCCSB's motions in June and August of 2002.
 {¶ 4} In October of 2002, the magistrate issued her decision concluding that it was in Jeremy and Steven's best interest that permanent custody be granted to HCCSB. After a series of procedural events that are not relevant to the issues on appeal, the trial court adopted the magistrate's decision and granted permanent custody to the agency. Appellant appealed this judgment.
 {¶ 5} In her sole assignment of error, Appellant argues that the court erred in finding that it was in the boys' best interest to grant permanent custody to HCCSB.
 {¶ 6} Clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" to be: "The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
 {¶ 7} In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-104,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71,74, 564 N.E.2d 54, 60. In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel,55 Ohio St.3d at 74. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
 {¶ 8} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the Court explained in Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273, 1276: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of proffered testimony."
 {¶ 9} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Stantosky v. Kramer (1982),455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Murray (1990),52 Ohio St.3d 155, 156, 556 N.E.2d 1169. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In reCunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034, quoting In reR.J.C. (Fla.App. 1974), 300 So.2d 54, 58. Thus, the state may terminate parental rights when the child's best interest demands such termination because of parental unsuitability.
 {¶ 10} R.C. 2151.413(D)(1) provides that, absent one of the extenuating circumstances delineated in (D)(3), "if a child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 19, 1999, the agency with custody shall file a motion requesting permanent custody of the child." (Emphasis added.) Appellant does not dispute that Jeremy and Steven have been in HCCSB's custody for twelve or more months of a consecutive twenty-two month period.
 {¶ 11} After the filing of a motion for permanent custody, R.C.2151.414(A)(1) requires the trial court to hold a hearing. The primary purpose of the hearing is to allow the trial court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1).
 {¶ 12} R.C. 2151.414(B)(1)(d) permits a trial court to grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that the child has been in the temporary custody of the agency for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999. The court need not find that the child cannot or should not be placed with either parent within a reasonable time. See In re Decker, Athens App. No. 00CA42, 2001-Ohio-2380; In re Moody (Aug. 7, 2000), Athens App. No. 99CA63. Such a finding is implicit in the time frame established by the statute.
 {¶ 13} R.C. 2151.414(D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(e)(7) to (11) apply.[1]
 {¶ 14} In this case, we find ample competent, credible evidence to support the trial court's decision to award HCCSB permanent custody of both Jeremy and Steven. See Appendix, Summary of Testimony. The evidence reveals that, as of the date of the permanent custody hearing, the boys had been in HCCSB's temporary custody for at least twelve of the prior twenty-two months. See R.C. 2151.414(B)(1)(d). Further, the evidence supports the view that the children's best interests would be served by awarding HCCSB permanent custody. See R.C. 2151.414(D).
 {¶ 15} Under the first factor of R.C. 2151.414(D), the court recognized that the boys have a poor relationship with their mother characterized by a pattern of stealing and alcohol use. Appellant clearly allowed her children, particularly Jeremy, to use alcohol and participate in or observe other improper activities. Further, the evidence demonstrates that both boys have flourished in the foster home and appear to have strong ties to their foster family.
 {¶ 16} As to the second factor, Jeremy expressed his desire to have no further communication with Appellant. While Steven wanted to continue visiting his mother, he clearly wishes to continue residing with his foster family. Given Steven's age, the desire to continue contact with his mother is normal.
 {¶ 17} The custodial history reflects that this is the second time Jeremy has been removed from his mother's custody and the second motion for permanent custody which has been filed. Both Jeremy and Steven had been residing with the Reeses for approximately two years at the time of the hearing. As the court noted, the foster parents have helped address issues of stealing, lying and poor school performance. The evidence demonstrates that involvement with Appellant causes the boys, especially Steven, to regress in their behaviors. As the court notes, a legally secure environment cannot be created without the granting of permanent custody to HCCSB. Lastly, the court noted that R.C. 2151.414(E)(11) is applicable here as Appellant previously lost custody of the boys' sibling, Dontaine.
 {¶ 18} Our review of the record and the factors delineated in R.C. 2151.414(D) demonstrates that the evidence clearly and convincingly supports the trial court's finding that it is in Jeremy and Steven's best interest for permanent custody to be granted to HCCSB. Appellant's sole assignment of error is overruled and the judgment of the trial court is affirmed.
JUDGMENT AFFIRMED.
 APPENDIX Summary of Testimony {¶ 1} Jeremy testified that he is sixteen years old and just completed ninth grade. He has lived with Trish and Jeff Reese for about two years. His brother, Steven, who is eight years old, also lives with the Reeses. Jeremy acknowledged that he told the guardian ad litem that he does not want to live with Appellant because he doesn't believe he will have a successful future if he is returned to her custody. Currently, Jeremy plans to graduate from high school. Jeremy also testified that he works at Steak Shake and does not want to live with Appellant because there is nowhere to work near her home. He has plans to go camping, to Kings Island, and to Cedar Point with his foster family.
 {¶ 2} Jeremy testified that during his visits with Appellant, they fight. Steven does not act like himself around Appellant. Steven is nice and kind at his foster home but acts like a "brat" when visiting Appellant. After the visits, Steven is extremely grouchy.
 {¶ 3} Jeremy testified that he had delinquency counts against him when he lived with Appellant but hasn't had any violations since living with the Reeses. Jeremy is going to pass all his classes.
 {¶ 4} Jeremy stated that during unsupervised visits with Appellant, she had alcohol in her bedroom closet. Within the past year, Appellant and her ex-boyfriend, Bruce Smith, drank alcohol during the boys' visits. Bruce is now eighteen years old but was seventeen at the time the drinking occurred. On one occasion within the last year, Appellant became intoxicated while at a friend's home and drove home with the boys in the car. Jeremy had to keep her awake while she was driving. Jeremy also testified that he drank alcohol during more than one visit with Appellant. Appellant also has pornography in her home which Jeremy and Steven can access if they want.
 {¶ 5} During one visit with Appellant, the boys were going fishing and needed ice so Jeremy stole some. He was not caught but the Reeses observed the theft. Appellant saw Jeremy steal the ice but did not tell him to put it back or that it was wrong to steal.
 {¶ 6} Jeremy testified that when he returned to his foster home after visiting his mother, he would sometimes have stolen items including games and headphones. Jeremy told Appellant he doesn't have the nerve to steal anymore.
 {¶ 7} Jeremy stated that he does not want Steven living with Appellant because he doesn't want Steven to be the way that he used to be. Jeremy testified that he now has better hygiene and is getting passing grades at school. Jeremy didn't get good grades when he lived with Appellant and his self-esteem is now better. Jeremy doesn't feel that he has a bond with his mother. He doesn't know if Appellant can provide the necessities the boys need because she doesn't have a job. Jeremy is comfortable in his foster home and doesn't want to be moved. Jeremy acknowledged that he lied and stole while he lived with Appellant. He stated that he has changed for the better since his removal and no longer wishes to visit with Appellant.
 {¶ 8} Sharon Kuss testified that she is a therapist and community liaison for Tri-County Mental Health. She began seeing Jeremy in February 2000 when he was still living with Appellant. When the boys were removed in September 2000, she began seeing Jeremy, Steven and Appellant in a family therapy setting.
 {¶ 9} When Ms. Kuss first started seeing Jeremy, he was argumentative, oppositional, non-compliant, and very destructive. He was constantly in trouble at home and at school and "out of control." Since then, Jeremy's behavior problems have gone away. He is no longer argumentative or oppositional and complies with rules. Jeremy is also much more mature and able to deal with complex emotions.
 {¶ 10} Steven's behavior, however, has remained problematic. His compliance with rules has improved but he has problems with attentiveness and telling the truth. Steven is on medication for attention deficit hyperactivity disorder.
 {¶ 11} In August 2001, Ms. Kuss ended Appellant's participation in the family therapy sessions after an accumulation of disturbing incidents. The final incident that resulted in the termination was Appellant's involvement with Bruce Smith. After discussing the situation with the clinical staff, Ms. Kuss determined that this involvement was not psychologically healthy for the boys and that Appellant needed to work on her own issues.
 {¶ 12} Ms. Kuss also had concerns about Appellant's parenting because Appellant made inappropriate and disturbing decisions. For example, Appellant did not think it was a big deal that Jeremy stole the ice. Ms. Kuss thought Appellant's behavior was problematic because Appellant allowed Jeremy to steal and other children were present. Ms. Kuss also had concerns about Appellant's participation in family therapy because she coached the boys to lie about what happened during their visits. If Appellant believed her actions during visitation were acceptable, she would have no need for them to lie. Appellant also participated in sessions during which the boys stated that Bruce Smith was strictly Jeremy's friend. However, Appellant later admitted that Bruce Smith was her "significant other." By her silence, she encouraged her sons to lie. Further, as therapy progressed, it became clear to Ms. Kuss that Appellant was not incorporating the things she learned in her interactions with the boys.
 {¶ 13} Although the original goal was reunification, as therapy progressed the goal became getting the boys to a healthier psychological state. Reunification was no longer the primary goal. Ms. Kuss testified that she believes that if Jeremy is reunified with Appellant, his progress will deteriorate because he will be unable to resist Appellant's influence. If Steven is reunified with Appellant, the child he could be will be lost because Appellant's decision making and moral development will bring him down. Lying and stealing will become acceptable behavior again. Ms. Kuss believes that Steven will ultimately have problems like Jeremy had if he is returned to Appellant.
 {¶ 14} Ms. Kuss testified that Appellant was instructed to attend empowerment group meetings for parents of children on the unruly team. However, Appellant only attended 16 of 37 sessions and, for the last four months Jeremy was on the unruly team, Appellant did not attend any meetings. Moreover, while Appellant initially participated in the discussions during the meetings, her participation decreased as time passed and she even fell asleep during some of the sessions.
 {¶ 15} Ms. Kuss recommends that permanent custody of Jeremy and Steven be awarded to HCCSB. Jeremy's current environment is much healthier and Ms. Kuss attributes the progress he has made to his placement in foster care. While living with Appellant, Jeremy made almost no progress in terms of getting his behavior under control or improving his emotional maturity. Jeremy is still not at the point where the changes are fully fixed in his psyche so if he is returned home at this point, Ms. Kuss believes he could be influenced in the opposite direction.
 {¶ 16} Ms. Kuss testified that, in her opinion, Steven is extremely vulnerable and Appellant's influence would result in Steven becoming as dysfunctional as Jeremy was before. Steven is struggling to determine what is appropriate behavior. He has progressed because his foster home provides structure and moral guidance. Ms. Kuss believes that if Steven is returned to Appellant, he'll regress severely.
 {¶ 17} Ms. Kuss testified that she has observed a change in Steven's demeanor following his visits with Appellant. He is belligerent, rebellious and non-compliant. On occasions where he has not visited with his mother, Steven appears more relaxed and happier. Sometimes following visits, Jeremy also acts different. Jeremy is also much happier and more relaxed when he has not visited with his mother. Jeremy has stated that he does not want to visit Appellant any longer.
 {¶ 18} Penny Maxwell testified that she is a child case manager at Tri-County Mental Health. She started working with Jeremy in November 1999 after his therapist referred him to case management. When Ms. Maxwell first started working with Jeremy, he was mouthy and aggressive with no self-esteem. Jeremy performed poorly in school and had no friends. He was negative about everything and his clothes were dirty. Since being placed in foster care, Jeremy's grades have improved. Steven's grades fell approximately three to four months ago when overnight visits with Appellant commenced; however, his grades have improved since then.
 {¶ 19} When Ms. Maxwell asks Steven questions in front of Appellant, she can tell he is afraid to answer them. Steven doesn't want to hurt his mother but knows he is not telling the truth.
 {¶ 20} Ms. Maxwell testified that there is a lot of conflict between Appellant and Jeremy during their visits. At the last visit, Appellant was 35 minutes late and the boys had already left. Appellant has missed a lot of the unruly team meetings that she was ordered to attend by the court.
 {¶ 21} Ms. Maxwell testified that she observed Appellant's previous home on Second Street in Logan. It was very cluttered and dirty and there were a lot of animals there. As a result of Jeremy's destruction of a room and other issues with her landlord, Appellant was evicted. Ms. Maxwell last visited Appellant's current residence in Thurston the week prior to the hearing. She has been there a total of three times. The kitchen is very cluttered and there are boxes in the living room. Ms. Maxwell also observed urine stains on the living room floor. When Ms. Maxwell left the residence, she had flea bites on her ankles.
 {¶ 22} According to Ms. Maxwell, Appellant doesn't seem to see what the problems are with her children and turns things around and blames them on the boys. Ms. Maxwell believes it would be detrimental to the boys if they are returned to Appellant.
 {¶ 23} Sally Lanning testified that she is the Supervisor of the Ongoing Unit at Hocking County Children's Services. Ms. Lanning testified that visitation between Appellant and her children has changed several times from supervised to unsupervised and then back. There has been a continuing problem of Appellant coaching the boys, and during a team meeting regarding Jeremy's theft of the ice, Appellant's attitude was that it was "no big deal" because it was only a bag of ice and no one would miss it.
 {¶ 24} The agency also had concerns about Appellant's relationship with Bruce Smith because Appellant was providing mixed information regarding Bruce's name and age. Appellant initially identified him as her nephew, then her cousin, and finally as Jeremy's friend. Eventually, Appellant acknowledged a physical and sexual relationship between her and Bruce Smith. Appellant agreed to bring Bruce Smith to one of the family counseling sessions because the boys weren't accepting him and Appellant acknowledged he was living with her. Ms. Lanning received a call from Fairfield County Children's Services indicating that Appellant had applied for benefits for Bruce Smith as his guardian. When Ms. Lanning spoke to Appellant, she stated that she had a guardianship over Bruce and had applied for Medicaid and food stamps on his behalf. Fairfield County Children's Services informed Appellant that they did not want Bruce Smith living in her home. Eventually, Bruce left Appellant's home but Ms. Lanning is uncertain as to the circumstances surrounding his departure.
 {¶ 25} Ms. Lanning testified that, in August or September 2001, she learned that Appellant was putting her utilities in Steven's name. Ms. Lanning was concerned because there were balances owed on the utilities and Appellant was obviously having trouble getting them back in her own name. Ms. Lanning ensured that Appellant changed the bills to her own name.
 {¶ 26} Ms. Lanning testified that, in September 2001, while Appellant was residing with her own mother, Jeremy returned from a visit with Appellant with pornographic magazines. Jeremy's grandmother confirmed that she was missing some magazines and Jeremy could have taken them.
 {¶ 27} At a team meeting with Appellant, the team initially decided to extend temporary custody of the boys for an additional six months rather than filing for permanent custody. The team made this decision because Appellant had found housing and was attending counseling. The team was attempting to get Appellant to attend the empowerment sessions through the unruly program. However, the team later decided to seek permanent custody of the boys because family counseling had been terminated as unsuccessful, Appellant was still not attending the empowerment group meetings, and the case worker reported that there were concerns regarding Appellant's utilities and financial problems. Further, Steven's behavior was deteriorating both at school and in the foster home and Jeremy no longer wanted to visit with his mother. The boys were also reporting that Appellant was saying negative things and Appellant was asking the foster parents for money to take the boys places.
 {¶ 28} Ms. Lanning does not believe that Appellant complied with the case plan because she failed to attend about half of the empowerment sessions while Jeremy was on the unruly team. Ms. Lanning also does not believe that Appellant's communication with the boys has improved. Further, Appellant continues to facilitate the boys' lying and stealing. Ms. Lanning acknowledged that Appellant has not used physical force on the boys and that her attendance at individual counseling has been good.
 {¶ 29} Appellant received gasoline and telephone vouchers from the agency and the agency made the down payment on Appellant's home and paid for car repairs. Ms. Lanning informed Appellant that the agency would provide gas vouchers when needed for visits and/or counseling. However, there were times when gas vouchers were unavailable to the agency.
 {¶ 30} Ms. Lanning testified that Appellant receives social security for herself but has a sanction against her payments because Appellant collected benefits for Jeremy for seven to nine months after he was removed from her custody. The agency was unaware at the time of Jeremy's removal that he was receiving social security benefits.
 {¶ 31} Patricia Reese testified that she has been Jeremy and Steven's foster mother since September 2000. When Jeremy first came to her home, he was extremely hyperactive and socially outcast. Mrs. Reese had to padlock the other boys' rooms because things would be missing. Neither Jeremy nor Steven thought stealing was a big deal. After about two months, Mrs. Reese started seeing some improvement.
 {¶ 32} Initially, there was no difference in the boys' behavior after visiting Appellant because they were already hyperactive and out of control. However, after about a year, their behavior would differ following visitation. After visiting with his mother, especially in the last few months, Steven is extremely angry and temperamental. However, Mrs. Reese acknowledged that Steven gets excited to see his mother.
 {¶ 33} When Jeremy first came to Mrs. Reese's home, he smoked cigarettes. Now, to Mrs. Reese's knowledge, the only time he smokes is when he is with Appellant.
 {¶ 34} Mrs. Reese testified that the boys' schooling and behavior was closely related to visitation with their mother. When overnight weekend visits with Appellant started, their behavior worsened. When visitation stopped, the boys improved but went downhill again when visitation recommenced.
 {¶ 35} Following one visit with his mother, Steven returned with his hair bleached and his scalp burned. Jeremy returned from visits with pornographic tapes and magazines. Mrs. Reese later learned that Jeremy stole the movies from Appellant's mother. Jeremy also returned from visits with inappropriate T-shirts and decorations that contained drug, sexual or gang related themes.
 {¶ 36} On two or three occasions, Mrs. Reese gave money to Appellant through the boys. There were a few other times when Appellant asked for money but Mrs. Reese did not give her any because she didn't have it.
 {¶ 37} Mrs. Reese testified that on one occasion, she was picking up another foster child from work. She observed Appellant's van at a nearby gas station and then saw Jeremy get out of the van and take some ice without paying for it. Either Appellant or Bruce Smith was driving the van. Mrs. Reese confronted Jeremy about the theft when he returned to the foster home.
 {¶ 38} Mrs. Reese acknowledged that, in December 2001, Steven was involved in a sexual encounter with another boy living at her home. It was determined, and Steven admitted, that he was the perpetrator of the incident. No charges were brought against either boy and both boys are currently in counseling regarding the incident. It was decided that it was in both boys' best interest to stay in the Reeses' home under closer supervision and stricter rules.
 {¶ 39} Lisa Geslack testified that she is an outpatient counselor with Tri-County Mental Health Counseling. She first met Appellant in April 2001. Ms. Geslack had approximately twenty-three sessions with Appellant with the last session occurring in March 2002. At that time, the counseling was temporarily postponed because Appellant was having surgery. Ms. Geslack has never met Jeremy or Steven.
 {¶ 40} Appellant's counseling attendance has been good and she is cooperative and participates in the sessions. Ms. Geslack testified that she has observed some improvement. However, while Appellant can verbalize healthy decisions, her actions don't always follow through on what she would verbalize. Ms. Geslack believes further counseling is necessary.
 {¶ 41} Dave Hardbarger testified that he is employed by Hocking County Children's Services and has been Jeremy and Steven's caseworker since November 2000, when the boys were already in placement and had supervised visitation with Appellant. At that time, Appellant and Jeremy argued during the visits and Steven would have minimal contact with Appellant. The visitations were lengthened from one to two hours and then changed to unsupervised visitations. However, after some incidents occurred, visitation was stopped for awhile and then reinstated under supervision. Quite often, Appellant was a few minutes late for her visits and, on one occasion, the boys left after twenty-five minutes and Appellant arrived forty-five minutes late. Sometimes, one of the boys would bring a "Game Boy" and Appellant would play with it while the boys played games with one another. Additionally, there were times when Appellant whispered to the boys during supervised visits even though Appellant was told not to because the visits were supposed to be monitored.
 {¶ 42} Mr. Hardbarger testified that he gave Appellant gas vouchers to make visits and phone cards to call the boys. In July 2001, Hocking County Children Services gave Appellant a down payment of $650.00 for her new residence. In June 2001, the agency paid for van repairs. In total, the agency provided Appellant with $1,219.56 in gas vouchers, phone cards, repairs, etc.
 {¶ 43} Mr. Hardbarger testified that Appellant was receiving social security disability and food stamps. She had a few different part-time jobs during the time Mr. Hardbarger worked with her. At various times, Appellant was behind on her utility payments.
 {¶ 44} During a family team meeting, Mr. Hardbarger discovered that Appellant was having a sexual relationship with Bruce Smith, who was only seventeen at the time. Appellant said Bruce Smith was going to be part of her life and the parties agreed to include him in family therapy.
 {¶ 45} When confronted about Jeremy's theft of the ice, Appellant stated that it was his idea. Mr. Hardbarger tried to stress that by allowing Jeremy to steal the ice, Appellant was supporting him in breaking the law and she should have had him return it or pay for it. Appellant saw nothing wrong with stealing the ice because of its low value.
 {¶ 46} Mr. Hardbarger testified that he asked Appellant if there were any relatives who Jeremy and Steven could be placed with and she said there were no suitable relatives. Nonetheless, Mr. Hardbarger pursued placements with Appellant's sisters, Alaina Christ and Barbara Yospur. Neither home was suitable. As to Ms. Christ, Mr. Hardbarger contacted Fairfield County Children's Services, went to their office, and looked through their files on Ms. Christ, her children and her significant other. Mr. Hardbarger concluded that Fairfield County Children's Services had involvement with the children living in Ms. Christ's home. As to Ms. Yospur, Mr. Hardbarger contacted Summit County Children's Services and learned that they had involvement with the children in her home. No relatives have ever contacted Mr. Hardbarger about taking the boys.
 {¶ 47} Mr. Hardbarger testified that Appellant's son, Dontaine, was removed from her custody in Fairfield County.
 {¶ 48} Mr. Hardbarger testified that when he informed Appellant about the fondling incident involving Steven, she didn't express any real concern.
 {¶ 49} Since Jeremy's testimony at the initial hearing on the permanent custody motion, the boys have had no visitation with Appellant because of Appellant's reaction towards Jeremy's testimony. Following that hearing, Mr. Hardbarger saw Appellant glaring at Jeremy and Jeremy saw Appellant saying something about him across the hall.
 {¶ 50} Also after the last hearing, Jeremy disclosed that Appellant encouraged the boys to steal videogames from the local K-Mart. Jeremy was afraid to tell Mr. Hardbarger because Appellant said Jeremy would never get off of probation if he told.
 {¶ 51} Mr. Hardbarger doesn't feel that the boys could return to Appellant within a reasonable period of time. Appellant did not follow through with the goals of the case plan. Family therapy was discontinued and, since the prior court date, Appellant's individual therapy has also been terminated. Further, Appellant had poor attendance in the empowerment group. Appellant also failed to make progress to become an active listener and did not build in equal time for the boys. She devoted more time to Jeremy than Steven. Mr. Hardbarger acknowledged that Appellant signed releases of information for the agencies to communicate as required by the case plan. She also stopped using physical discipline and attended about 75% of her individual counseling sessions. The boys indicated that Appellant still called them names.
 {¶ 52} In Appellant's case-in-chief, Steven Large testified in camera that he is eight years old and finishing third grade. Steven likes living with the Reeses except for the consequences if he does something wrong, like having to write sentences. Steven testified that he gets along fine with Jeremy, although they sometimes get in arguments. Steven likes going to school in Lancaster and has quite a few friends. Steven also likes visiting Appellant. Steven indicated that he wanted to continue living with the Reeses but seeing Appellant "like five to six times a week."
 {¶ 53} Barbara Yospur testified that she is Appellant's half-sister and she sees Appellant two to three times per year. The last time she saw Appellant and the boys together was Christmas 2001. She did not observe any conflicts at that time and Appellant and the boys appeared to be a normal, functioning family.
 {¶ 54} Mrs. Yospur testified that no one from Children's Services ever contacted her about taking temporary custody of the boys and that she would have been interested in such an arrangement. She acknowledged that she never contacted Children's Services and offered to take the boys. At the time the boys were initially removed, Mrs. Yospur had a new baby and she always hoped that the boys would be returned to Appellant.
 {¶ 55} Mrs. Yospur testified that she has a home in Akron with six bedrooms and a yard. She lives in a nice neighborhood in a good school district. Mrs. Yospur has six children of her own aged two to fifteen years old. Mrs. Yospur is currently not working. She is disabled because she was hurt in a car accident and has to have knee surgery. Mrs. Yospur has been unemployed for three years but she intends to return to work as a computer programmer.
 {¶ 56} Mrs. Yospur and her husband have been separated for five months. Mrs. Yospur's current husband fathered her youngest three children. Her three older children have two different fathers. Mrs. Yospur receives child support for her eight and ten year old, but not for her oldest child. Mrs. Yospur's current income is child support and social security income for her oldest daughter in the amount of $545.00 per month. Mrs. Yospur acknowledged that she has dealt with Children's Services on occasion regarding her own children but they have never been removed from her home.
 {¶ 57} Alaina Jane Crist testified that she is Appellant's eldest half-sister. She sees Appellant every couple of weeks. Before the boys were removed, they interacted "just fine" with Appellant. Ms. Crist stated that she has never seen Appellant's house dirty but she hasn't been to Appellant's current house in Thurston. Ms. Crist acknowledged that she probably hasn't been to Appellant's house in over three years. She has never known Appellant to lie to her.
 {¶ 58} Ms. Crist testified that she has four children ranging in age from twenty-two to eleven, and a common-law husband. Two of her children are from a previous marriage. Ms. Crist resides in a four bedroom, two and one-half bath home. Her oldest son does not live with her. Ms. Crist testified that her annual household income is about $60,000 per year. Ms. Crist is currently unemployed but beginning a new job as a nursing assistant the following day. Her husband is a truck driver.
 {¶ 59} Ms. Crist testified that she told Appellant she would take the boys when they were first removed; however, she was never contacted by Children's Services. Later in her testimony, Ms. Crist stated that she told Appellant she could take Steven but didn't know if she could take Jeremy. However, she stated she would rather have taken both of them than have them split up.
 {¶ 60} Appellant testified that she is thirty-seven years old and has had three children — Jeremy, Dontaine and Steven. Dontaine was removed from her custody when he was nine months old. The court ultimately awarded permanent custody of Dontaine to Fairfield County Children's Services. Jeremy was originally removed from Appellant's custody in 1990 and was out of her custody for two years. However, an award of permanent custody to Fairfield County Children's Services was reversed on appeal. Appellant also acknowledged that she was charged with criminal child endangering in 1991 in Fairfield County but the charges were dismissed because of a lack of evidence.
 {¶ 61} Appellant testified that she had problems attending counseling because she didn't have gas or had problems with her vehicle. Appellant hasn't had a vehicle for the last three months because of needed repairs. Appellant also missed counseling because she had surgery and took six weeks to recover. Appellant testified that she did not believe the empowerment sessions were helpful and that she was not counseled on how to be a parent. Appellant acknowledged that she didn't participate very much in the empowerment group.
 {¶ 62} Appellant testified that she attempted to be a more active listener to the boys. Appellant also tried to make equal time for the boys but acknowledged she could have been more successful. Appellant indicated that she hasn't used physical discipline on Steven since she became involved with Children's Services. According to Appellant, she complied with most of the items in the case plan.
 {¶ 63} Appellant testified that, in May 2002, she was going fishing with the boys and checked to see if she had money for ice. She didn't have enough money so Jeremy offered to jump out of the van and get a bag, which he did, and they left. Appellant did not tell Jeremy not to steal the ice. Appellant also acknowledged that, in the last two years, she has stolen items to give the boys gifts.
 {¶ 64} Appellant testified that she allowed Jeremy to consume alcohol one time within the last year. She denied smoking marijuana with or in front of Jeremy. Appellant acknowledged that on one occasion within the last year, she drove with Jeremy and Steven after she had been drinking.
 {¶ 65} Appellant testified that she did not have a sexual relationship with Bruce Smith. Bruce was having problems at his home. Appellant is friends with Bruce's family and his parents asked if he could live with Appellant to see if he could improve. The main reason Appellant agreed to allow Bruce to live with her was because he got along so well with Jeremy and Steven. Bruce lived with her for three months.
 {¶ 66} Appellant testified that she did not express concern when Dave Hardbarger told her about the sexual incident involving Steven because Steven had already told her about it and they had discussed the incident. Further, Appellant testified that she was extremely upset about the incident but coped with her feelings by acting like it didn't bother her. Appellant acknowledged that Steven did not tell her that he was the perpetrator of the incident.
 {¶ 67} Appellant testified that she asked the Reeses for money on two occasions to take the boys to the movies. She didn't pay them back because she wasn't asked to repay them.
 {¶ 68} Appellant testified that she believes she could have the boys back in her home at sometime in the near future. Mainly, Appellant needs to obtain a job. Her last job was at the Citgo in Baltimore in December 2001. Appellant thinks that Jeremy has always wanted a better life than he had with her and to live in a two parent home.
 {¶ 69} Appellant testified that she receives social security income in the amount of $490.00 per month because she has osteoarthritis. Appellant stated that she received social security for Jeremy until October 2000. Jeremy was receiving social security for his attention deficit hyperactivity disorder. Appellant's rent is $152.00 per month and her van payment is $150.00 per month. The van payment was originally $250.00 per month but was reduced because she couldn't afford the payments.
 {¶ 70} Appellant denied making comments about Jeremy following his testimony on the previous hearing date.
 {¶ 71} On rebuttal, Jeremy testified in camera. Jeremy stated that, following the last hearing, Jeremy observed Appellant talking to his aunts and "cussing him out." Appellant stated "that son-of-a-bitch over there is telling lies and [he] better shut the F up."
 {¶ 72} Jeremy testified that on about five occasions while Appellant was living on Thurston, she gave alcohol to Jeremy. Steven tried some of the alcohol on one occasion. Also, Jeremy, Appellant and Bruce Smith had smoked marijuana together. Jeremy rode with his mother once after she had been drinking. She was driving approximately twenty miles per hour and falling asleep. Jeremy was also intoxicated at the time. Jeremy testified that his mother drank in moderation almost every time they visited her but she only drove once while she was drunk. Jeremy testified that, since their removal, Appellant would take Jeremy and Steven to a store to pick out what they wanted and then she would steal it.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, J. and Abele, J.: Concur in Judgment and Opinion.
[1] R.C. 2151.414(E)(7) to (11) provide: "(7) The parent has been convicted of or pleaded guilty to one of the following: (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense; (b) An offense under section 2903.11, 2903.12, or 2903.13
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense; (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense; (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense; (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section. (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body. (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent. (10) The parent has abandoned the child. (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.