DECISION AND JUDGMENT ENTRY
{¶ 1} Mary Nibert appeals a judgment of the Gallia County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, Mary M. Nibert (Mary), to Gallia County Children's Services (GCCS). Mrs. Nibert contends the court's interrogation of the state's expert was biased. Because the record indicates the court interrogated Dr. Kirkhart in an impartial manner, we find no error. Mrs. Nibert also contends the court's grant of permanent custody to GCCS is against the manifest weight of the evidence. Because the record contains some competent, credible evidence to support the court's decision, we disagree. Accordingly, we affirm the judgment of the trial court.
 {¶ 2} Mrs. Nibert has had a long history with GCCS. At various times throughout the years, GCCS has had temporary custody of Mrs. Nibert's four minor children. Most recently, GCCS had temporary custody of Mary (d.o.b. 3/27/93). GCCS returned Mary to her mother's custody on March 4, 2003. Two weeks later, an incident occurred in which Mary allegedly assaulted the school principal. Following the incident, GCCS filed a complaint alleging that Mary was a dependent child. The complaint sought emergency temporary custody of Mary. Subsequently, GCCS modified its complaint to request permanent custody.
 {¶ 3} While this case was pending in the trial court, Willis Nibert, Mary's father, passed away. In July 2003, the trial court held a permanent custody hearing. Following the one-day hearing, the court determined that it was in Mary's best interest for permanent custody to be awarded to GCCS. Thus, the court terminated Mrs. Nibert's parental rights and awarded permanent custody of Mary to GCCS. Mrs. Nibert now appeals and raises the following assignments of error: "ASSIGNMENT OF ERROR NO. 1 — The trial court committed prejudicial error when it continually interjected and questioned Dr. Evelyn Kirkhart, in order to attempt to get the psychologist to testify in conformity with the court's opinion. ASSIGNMENT OF ERROR NO. 2 — The trial court's ruling in this case, placing permanent custody with Gallia County Children's Services, is not supported by clear and convincing evidence that it is in the child's best interest. ASSIGNMENT OF ERROR NO. 3 — The trial court erred in its finding in this case that were (sic) intended to justify the termination of the mother's parental rights. ASSIGNMENT OF ERROR NO. 4 — The evidence presented by the Gallia County Children's Services was not sufficient to justify taking permanent custody from the mother."
 {¶ 4} Our initial review of the record failed to disclose an entry adjudicating Mary a dependent child. Therefore, we issued an entry ordering the parties to either supplement the record or advise us regarding the court's adjudication of dependency. In response, we received a nunc pro tunc entry of dependency from the trial court. In the entry, the court acknowledged its failure to journalize the adjudication of dependency and indicated that it has adjudicated Mary a dependent child "as a prerequisite of the award of permanent custody."
 {¶ 5} Although the record now contains an adjudication of dependency, we remain concerned about certain procedural aspects of this case. There is nothing in the record to indicate that the court held an adjudicatory hearing prior to the day of the dispositional hearing. See Juv.R. 34(A). Furthermore, there is nothing in the record to indicate that the parties consented to the dispositional hearing being held immediately after the adjudicatory hearing, assuming the hearings were held on the same day. See Id. However, Mrs. Nibert has not raised an objection regarding the manner in which the case proceeded. Moreover, neither party has indicated that the case did not proceed in the required manner, despite an opportunity to do so following our entry. Thus, we will presume regularity in the proceedings below since neither party has indicated otherwise. Accordingly, we proceed to the merits of Mrs. Nibert's appeal.
 {¶ 6} In her first assignment of error, Mrs. Nibert challenges the court's interrogation of the state's expert, Dr. Kirkhart. She contends the court questioned Dr. Kirkhart in an attempt "to get the psychologist to testify in conformity with the court's opinion." Because Mrs. Nibert did not object to the court's questioning of Dr. Kirkhart, she has waived all but plain error.
 {¶ 7} Although the plain error doctrine is applied almost exclusively in criminal cases, it may be applied in civil cases.Reichert v. Ingersoll (1985), 18 Ohio St.3d 220, 223,480 N.E.2d 802. However, the doctrine is not favored in civil cases and thus, will only be applied in the extremely rare case where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."Goldfuss v. Davidson, 79 Ohio St.3d 116, 1997-Ohio-401,679 N.E.2d 1099, syllabus.
 {¶ 8} Evid.R. 614(B) permits the trial court to interrogate witnesses in an impartial manner. A trial court has a duty to see that the truth is developed and therefore, should not hesitate to ask a proper, pertinent, and even-handed question. Akron-CantonWaste Oil, Inc. v. Safety-Kleen Oil Serv. Inc. (1992),81 Ohio App.3d 591, 610, 611 N.E.2d 955. Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, we presume that the court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth. State v. Baston, 85 Ohio St.3d 419, 426,1999-Ohio-280, 709 N.E.2d 128, quoting Jenkins v. Clark (1982),7 Ohio App.3d 93, 98, 373 N.E.2d 1244. See, also, In reWhitaker (April 13, 1987), Scioto App. No. 1619. A trial court's interrogation of a witness is not impartial merely because it elicits evidence that is damaging to one of the parties. Statev. Blankenship (1995), 102 Ohio App.3d 534, 548, 657 N.E.2d 559.
 {¶ 9} Mrs. Nibert points to two instances of allegedly improper questioning. The first occurred during defense counsel's cross-examination of Dr. Kirkhart. On cross-examination, counsel asked Dr. Kirkhart if the results of the IQ test she performed on Mrs. Nibert were significantly higher than the results of a prior IQ test, which had been performed in 2002. When Dr. Kirkhart indicated that they were, the court questioned her further about the results of the IQ tests. The court asked Dr. Kirkhart what Mrs. Nibert's scores had been. It then questioned Dr. Kirkhart about the breakdown of the scores and the discrepancy between the results. Having reviewed the court's exchange with Dr. Kirkhart, we find nothing improper about the court's questions. The record indicates that the court was merely attempting to clarify Dr. Kirkhart's testimony and further develop the relevant facts. In doing so, the court remained impartial.
 {¶ 10} The second instance of allegedly improper questioning occurred after both parties had finished questioning Dr. Kirkhart. Following defense counsel's recross, the court questioned Dr. Kirkhart about various issues that caused it concern. For instance, it questioned whether Mary's young age made testing her more difficult and whether Mary understood the implications of her responses. The court also expressed concern about Mary's conception of male/female roles and asked whether Mrs. Nibert could act as a "strong female figure" for Mary. In addition, the court questioned Dr. Kirkhart about Mary's sexual knowledge, which, according to Dr. Kirkhart's testimony, was an "inordinate amount * * * for a child her age."
 {¶ 11} Mrs. Nibert contends that during this exchange, the court attempted "to put words into Dr. Kirkhart's mouth." We disagree. There is nothing in the court's questions that indicate an attempt to elicit a partisan response. Rather, the record indicates that the court conducted its interrogation of Dr. Kirkhart in an impartial manner. Dr. Kirkhart could just have easily answered the court's questions in a manner favorable to Mrs. Nibert. Unfortunately, she did not. Dr. Kirkhart's unfavorable responses in no way indicate that the court's questions were biased. The record reveals that the court was attempting to elicit Dr. Kirkhart's opinion and develop facts relevant to the issues it would ultimately be called upon to decide. In doing so, it posed proper, pertinent, and even-handed questions. We find no error in the court's interrogation of Dr. Kirkhart and thus, there can be no plain error. Accordingly, Mrs. Nibert's first assignment of error is overruled.
 {¶ 12} Because Mrs. Nibert's remaining assignments of error are related, we will address them together. Here, Mrs. Nibert challenges the court's decision to award permanent custody to GCCS.
 {¶ 13} There are two ways that an authorized agency may obtain permanent custody of a child under Ohio law. The agency may first obtain temporary custody and then subsequently file a motion for permanent custody, or the agency may request permanent custody as part of its original abuse, neglect, or dependency complaint. R.C. 2151.413, R.C. 2151.27(C), and R.C.2151.353(A)(4). See, also, In re Ward (Aug. 2, 2000), Scioto App. No. 99CA2677. In this case, GCCS modified its original dependency complaint to request permanent custody of Mary.
 {¶ 14} In order to grant permanent custody in its initial disposition, the trial court must determine that permanent custody is in the best interest of the child under R.C.2151.414(D) and that the child cannot be placed with one of her parents within a reasonable time or should not be placed with either parent under R.C. 2151.414(E). See R.C. 2151.353(A)(4). Mrs. Nibert appears to challenge both of the court's findings in this case.
 {¶ 15} An award of permanent custody must be supported by clear and convincing evidence. In re Hiatt (1993),86 Ohio App.3d 716, 725, 621 N.E.2d 1222. "Clear and convincing evidence" is evidence that will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. See Cincinnati Bar Assn. v. Massengale (1991),58 Ohio St.3d 121, 122, 568 N.E.2d 1222; In re Meyer (1994),98 Ohio App.3d 189, 195, 648 N.E.2d 52. It is considered a higher degree of proof than a mere "preponderance of the evidence," the standard generally utilized in civil cases; however, it is less stringent than the "beyond a reasonable doubt" standard used in criminal trials. See Landsowne v. Beacon Journal Pub. Co.
(1987), 32 Ohio St.3d 176, 180, 512 N.E.2d 979, quoting Cross v.Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
 {¶ 16} When reviewing an order terminating parental rights, an appellate court must examine the record to determine whether the trier of fact had before it sufficient evidence to satisfy the clear and convincing standard. See In re Large, Hocking App. Nos. 03CA9 and 03CA10, 2003-Ohio-5275, at ¶ 7; In reLewis, Athens App. No. 03CA12, 2003-Ohio-5262, at ¶ 14. See, also, In re Wise (1994), 96 Ohio app.3d 619, 626,645 N.E.2d 812. If the record contains some competent, credible evidence going to all the essential elements of the case, an appellate court may not reverse the trial court's judgment. State v.Schiebel (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. Moreover, we will not substitute our judgment for that of the trial court when there exists competent and credible evidence supporting the trial court's findings and decision. See Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the Supreme Court of Ohio explained in Seasons Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of proffered testimony."
 {¶ 17} In her second assignment of error, Mrs. Nibert challenges the court's finding that it is in Mary's best interest for permanent custody to be granted to GCCS. In her third assignment of error, Mrs. Nibert challenges the court's ruling as a whole. However, the argument contained within Mrs. Nibert's third assignment of error is mainly directed towards the court's best interest ruling. Thus, we will address it here.
 {¶ 18} R.C. 2151.414(D) sets forth specific factors the court must consider in determining whether the child's best interest would be served by granting the motion for permanent custody. These factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.[1] See R.C. 2151.414(D).
 {¶ 19} Having reviewed the record, we conclude that competent, credible evidence exists to support the court's finding that Mary's best interest would be served by awarding permanent custody to GCCS.
 {¶ 20} The first factor deals with interpersonal relationships. The evidence indicates that Mary has a poor relationship with her mother and brothers. Although Mrs. Nibert testified that she loves Mary and is bonded with her, Dr. Kirkhart testified that Mary is not bonded well with her mother. She testified that Mary has negative feelings about her mother and that she refers to her mother as "evil". The evidence indicates that Mary's older brother is physically abusive towards her. The guardian ad litem testified that Mary's older brother is a "very dangerous individual" and that, in his opinion, the brother's presence in the household would endanger Mary's health, safety, and welfare. Furthermore, Mary has made allegations of sexual abuse against her older brother. According to Dr. Kirkhart, Mary also refers to her brothers as "evil". In contrast, the evidence indicates that Mary has a positive relationship with her foster mother. Three of the state's witnesses testified that Mary has formed a bond with her foster mother. Additionally, Mary's case manager, Sheana Bays, testified that Mary is happy in her new home and that her behavior has improved while there.
 {¶ 21} The second factor concerns the child's wishes. The evidence indicates that Mary does not wish to return to her mother. Although the record does not contain a transcript of the trial court's in camera discussion with Mary, the court's entry indicates that Mary expressed a desire to remain with her foster care family. Likewise, the guardian ad litem testified that Mary never expressed a desire to go home. He testified that previously when Mary learned she would be going home, she expressed a desire to remain in foster care. Finally, Mary indicated to Dr. Kirkhart that she did not want to return home. We also note that the guardian ad litem advocated terminating Mrs. Nibert's parental rights.
 {¶ 22} Concerning the third factor, the custodial history of the child, Chandra Shrader, the director of GCCS, testified that GCCS has had custody of Mary on three prior occasions. The evidence indicates that GCCS had custody of Mary in early 2003 but returned her to her mother's custody in March 2003. Mary had only been back in her mother's custody two weeks when GCCS filed the present dependency complaint.
 {¶ 23} The fourth factor is the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. Again the record supports the court's decision to award GCCS permanent custody. Dr. Kirkhart testified that Mary has significant psychological problems that need to be addressed as she grows up. She testified that Mary will require expert psychiatric care and that Mary's condition will require a lot of social service input. According to Dr. Kirkhart, Mary needs to be placed with someone that will work "hand in glove" with the social service agencies. When asked whether Mrs. Nibert could provide the type of environment and care that Mary needs to grow up and lead a normal life, Dr. Kirkhart indicated that it was "a long shot". She testified that Mary needs to be in an environment that is more stable than the one Mrs. Nibert is currently able to provide.
 {¶ 24} During her testimony, Dr. Kirkhart emphasized the necessary role of social service agencies in addressing Mary's problems. As indicated, she testified that whoever received custody of Mary would need to work "hand in glove" with social service agencies. However, the record shows that in the past, Mrs. Nibert has been unwilling to work with GCCS in their attempts to create a home environment that Mary could return to. The guardian ad litem testified that in 2002, he worked with GCCS and mental health professionals to prepare a list of recommendations designed to create an acceptable home environment for Mary. The recommendations included such things as parenting classes for Mrs. Nibert, psychological treatment for Mrs. Nibert, psychological care for Mary, drug and alcohol testing, and removing Mary's older brother from the home. According to the guardian ad litem, none of the fourteen recommendations on his list has been accomplished to date. Moreover, Ms. Shrader testified that GCCS has utilized every service they have available to aid Mrs. Nibert, including having national trainers work on Mary's case. She testified that while Mrs. Nibert participates in the beginning, she fails to follow through with the services. Finally, portions of Mrs. Nibert's testimony appear to indicate hostility towards GCCS. While discussing GCCS, Mrs. Nibert stated: "I don't like to deal with people that make allegations against me that don't know me." She further stated: "I especially get mad when people lie [about] me." Mrs. Nibert's seeming hostility towards GCCS, raises questions about whether she could work "hand in glove" with them.
 {¶ 25} Moreover, Mrs. Nibert is adamant about her intention to return Mary to a home that includes her older brother. However, the record indicates that Mary's older brother is physically abusive towards her. The guardian ad litem testified that "if [Mary's older brother] is in the household then Mary's health, safety, and welfare is, is at extreme danger." He further testified that, in his opinion, Mary should never be returned to the presence of her older brother, stating that such a situation would be "very dangerous." Thus, the evidence supports the court's finding that a legally secure permanent placement cannot be achieved without a permanent grant of custody to GCCS. Consequently, we agree that Mary's best interests would be served by granting permanent custody to GCCS. Accordingly, Mrs. Nibert's second and third assignments of error are overruled.
 {¶ 26} In her fourth assignment of error, Mrs. Nibert contends the state failed to present clear and convincing evidence to support their motion for permanent custody. Although Mrs. Nibert's argument under this assignment of error is not entirely clear, we will presume it is directed towards the court's finding that Mary could not be placed with her within a reasonable time or should not be placed with her.
 {¶ 27} R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with the parents. The court must consider: "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. * * * (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * * (16) Any other factor the court considers relevant."
 {¶ 28} The trial court need not find the existence of each and every factor in R.C. 3151.414(E) before it may terminate parental rights. In re Wingo, 143 Ohio App.3d 652, 659,2001-Ohio-2477, 758 N.E.2d 780; In re Butcher (April 10, 1991), Athens App. No. 1170. Rather, the existence of one factor alone may support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. In re Butcher, supra. See, also, In re Hurlow
(Sept. 21, 1998), Gallia App. No. 98CA6.
 {¶ 29} In the present case, the trial court found that R.C.2151.414(E)(1) and (4) existed so as to mandate a finding that Mary could not be placed with her mother within a reasonable time or should not be placed with her mother. However, we conclude the court erred in relying on R.C. 2151.414(E)(1) to support its finding. Where R.C. 2151.414(E)(1) serves as the basis for granting permanent custody as the initial disposition, the agency has a duty to exercise reasonable efforts to reunify the parent and child after the child's removal from the home. In re Ward
(Aug. 2, 2000), Scioto App. No. 99CA2677; In re Lewis, Athens App. No. 03CA12, 2003-Ohio-5262, at ¶ 24. Thus, the agency must have given the parent a case plan and an opportunity to remedy the situation that initially caused the child's removal. Ward;Lewis. Here, GCCS made no effort to reunite Mrs. Nibert and Mary after March 2003. Accordingly, the trial court erred as a matter of law when it based its finding on R.C. 2151.414(E)(1). However, the error is harmless because there is competent, credible evidence to support the trial court's finding that R.C.2151.414(E)(4) exists.
 {¶ 30} In its entry, the trial court concluded that Mrs. Nibert demonstrated a lack of commitment towards Mary by (1) leaving for France while the child was in foster care and by failing to provide adequate emergency contacts, (2) failing to participate in various aspects of reunification plans and mental health recommendations; and (3) announcing her intentions to put the child back into the same type of environment from which most of her problems had occurred.
 {¶ 31} The record indicates that while Mary and her younger brother were in respite care, Mrs. Nibert went to France for a month. At the time, she still had custody of the two children even though they were in foster homes. While Mrs. Nibert told GCCS she planned on taking a vacation, she did not tell them when or where she was going. In addition, she failed to leave a phone number or address where she could be reached. Thus, although Mrs. Nibert still had custody of the children, GCCS had no way of contacting her in case of an emergency.
 {¶ 32} While Mrs. Nibert's failure to provide contact information demonstrates irresponsible parenting, we are not convinced that it indicates an unwillingness to provide an adequate permanent home. However, Mrs. Nibert's other actions, as addressed in the trial court's remaining findings, cause us to be greatly concerned about Mrs. Nibert's willingness to provide an adequate permanent home for Mary.
 {¶ 33} Dr. Kirkhart's testimony indicates that Mary suffers from significant psychological and emotional problems that are going to require years of treatment. Moreover, she indicated that Mary's problems will require the involvement of a number of social service agencies. However, the record indicates that so far, Mrs. Nibert has been unwilling to work with GCCS to provide an environment in which Mary can function. She has failed to comply with the guardian ad litem's recommendations and does not follow through with services provided by GCCS. According to Ms. Shrader, GCCS has exhausted every available resource in an attempt to aid Mrs. Nibert.
 {¶ 34} Moreover, as indicated, Mrs. Nibert's testimony indicates an apparent hostility towards GCCS. In addition, Mrs. Nibert's testimony leads us to question whether she would follow through with future GCCS programs if Mary were returned to her custody. She testified: "Just like I've told everyone in this room before, if you've got the magic answer I'm willing to listen. If it works I'll go for it, if it don't I don't see that, why go through the process." However, Mary's problems are not the type that can be fixed overnight. Dr. Kirkhart testified that Mary is going to need expert psychiatric help as she grows up, especially during her adolescent years. In addition, Dr. Kirkhart indicated that addressing Mary's problems is going to require a lot of social service input. Thus, going through "the process" is necessary even if the results are not immediately apparent.
 {¶ 35} Mrs. Nibert's past history of cooperation with GCCS and her apparent hostility towards GCCS, make it unlikely that she will, in the future, work with GCCS to create a adequate permanent home for Mary. Most concerning, however, is Mrs. Nibert's intention to reunite Mary with her older brother.
 {¶ 36} As noted, the record indicates that Mary's brother, who is five years older than Mary, is physically abusive towards her. In fact, the guardian ad litem testified that returning Mary to a home that included her brother would create a "very dangerous situation" and would endanger Mary's health, safety, and welfare. Additionally, the record indicates that Mary's brother may also have sexually molested her. Despite this evidence, Mrs. Nibert testified that she plans on putting Mary back in the same household as her older brother.
 {¶ 37} From the record, it appears Mrs. Nibert has chosen to ignore the danger her older son poses. Previously, the older son was charged with burning Mary's younger brother. The charges were ultimately dropped on the condition that Mary's older brother be removed from the home. Initially, Mrs. Nibert complied with the condition; however, she testified at trial that the younger brother has since been returned to the same household as the older brother. She then stated her intent to return Mary to the same household, indicating that "they're family". During her testimony, Mrs. Nibert acknowledged that her older son "can be kind of violent at times", but stated that "usually when he is violent like that somebody has done something to make him like that."
 {¶ 38} Mrs. Nibert's attitude towards her son's violence is a cause for great concern. Clearly, she sees nothing wrong with returning Mary to a household that includes an older brother who is physically, and possibly sexually, abusive towards Mary. Mrs. Nibert's intention to return Mary to such a household indicates an unwillingness to provide an adequate permanent home for Mary. Thus, the court did not err in concluding that Mary could not or should not be placed with Mrs. Nibert within a reasonable time. Accordingly, Mary's fourth assignment of error is overruled and the judgment of the trial court is affirmed.
Judgment Affirmed.
Kline, P.J. and Abele, J., concur in Judgment and Opinion.
[1] The statute also directs the court to consider whether any of the factors in R.C. 2151.414(E)(7) through (11) apply in relation to the parents and child. See R.C. 2151.414(D)(5). However, none of those factors are present in this case.