OPINION
{¶ 1} Appellant, Selena S.,[1] appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody of D.S., her son, to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.
 {¶ 2} On July 31, 2000, a complaint was filed, alleging that D.S., who was born on June 21, 1999, and his two older siblings were abused, neglected, and dependent minors. According to the complaint, on July 29, 2000, Charles S., the putative father of D.S. and his siblings, held appellant hostage. Police officers were summoned and, with the help of a negotiator, appellant was freed. Later, Charles S. purportedly was charged with domestic violence, assault, and menacing. According to the complaint, the relationship between appellant and Charles S. showed a pattern of domestic violence.
 {¶ 3} One day after the complaint was filed, the trial court, through a magistrate, granted temporary custody of D.S. and his siblings to FCCS. Several months later, on October 19, 2000, the trial court adjudicated D.S. and his siblings as dependent minors.
 {¶ 4} Following the July 29, 2000, incident, D.S. and his siblings were placed into the care of their maternal grandfather and their stepgrandmother. Later, on June 8, 2001, adopting a magistrate's decision, the trial court granted legal custody of the children to the maternal grandfather, although the children remained under the wardship of the court. However, while the children were living with their maternal grandfather and stepgrandmother, reports of physical abuse and sexual abuse were received by FCCS. Thereafter, FCCS removed the children from the care of their maternal grandfather and stepgrandmother. The trial court, through a magistrate, also issued an emergency care order.
 {¶ 5} After D.S. was removed from the home of his maternal grandfather and stepgrandmother, he was placed in a certified foster family home in April 2002. Alternate placement arrangements were made for D.S.'s older siblings. On March 28, 2003, the trial court adopted a magistrate's decision of March 11, 2003, which terminated the maternal grandfather's legal custody of the children and granted temporary custody of the children to FCCS.
 {¶ 6} Later, D.S.'s foster parents, Dan and Lisa Hitzemann, moved for custody of D.S. Geraldine Morrison, D.S.'s maternal great aunt, also moved for custody of D.S.; however, she later withdrew this motion.
 {¶ 7} On October 14, 2003, pursuant to R.C. 2515.413, FCCS moved for permanent custody of D.S., claiming that D.S. had been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period.[2]
Thereafter, on January 12, 2005, appellant moved for custody of D.S. and his siblings, claiming that she had substantially complied with the court-approved case plan and asserting that the conditions that warranted the children's removal had been remedied. That same day the paternal grandmother also moved for custody of D.S. and his siblings.
 {¶ 8} On January 25, 2005, the trial court conducted a hearing, wherein it considered the issue of D.S.'s placement into the permanent custody of FCCS. At this hearing, D.S.'s father did not contest FCCS's permanent custody motion.[3] (Tr. 22-23.) That same day, D.S.'s guardian ad litem filed a report and provisionally recommended granting FCCS's motion for permanent custody of D.S.
 {¶ 9} Finding it was in D.S.'s best interest to permanently commit him to the custody of FCCS for the purpose of adoption, the trial court granted permanent custody of D.S. to FCCS and divested appellant of all parental rights. From this judgment, appellant timely appeals and assigns a single error for our consideration: "The trial court erred in granting permanent custody of [D.S.] to Franklin County Children Services."
 {¶ 10} The right to raise a child is a basic and essential civil right. In the Matter of: J.Z., Franklin App. No. 05AP-8, 2005-Ohio-3285, at ¶ 9, citing In re Hayes (1997),79 Ohio St.3d 46, reconsideration denied, 79 Ohio St.3d 1492. Accordingly, a parent must be given every procedural and substantive protection that the law allows prior to the termination of parental rights. Id. See Hayes, at 48 (stating that "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' Therefore, parents `must be afforded every procedural and substantive protection the law allows.'") (Citations omitted.)
 {¶ 11} "[T]o terminate parental rights, the movant must demonstrate by clear and convincing evidence that (1) termination is in the child's best interests, and (2) one of the four factors enumerated in R.C. 2151.414(B)(1) applies." In the Matter of:J.Z., at ¶ 10, citing In re Gomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723, appeal not allowed, 102 Ohio St.3d 1473,2004-Ohio-2830. "Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." In the Matter of: J.Z., at ¶ 10, citing In reAbram, Franklin App. No. 04AP-220, 2004-Ohio-5435, appeal not allowed, 104 Ohio St.3d 1441, 2004-Ohio-7033. However, "[clear and convincing evidence] does not mean clear and unequivocal evidence and does not require proof beyond a reasonable doubt." Id. "An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." Inthe Matter of Siders (Oct. 29, 1996), Franklin App. No. 96APF-04-413, citing In re Brofford (1992), 83 Ohio App.3d 869,876-877; In re Hiatt (1993), 86 Ohio App.3d 716, 725, motion to file notice of appeal instanter denied, 67 Ohio St.3d 1406. See, also, In re Nibert, Gallia App. No. 03CA19, 2004-Ohio-429, at ¶ 15-16.
 {¶ 12} Here, the gravamen of appellant's assignment of error is a claim that FCCS failed to attempt reunification of D.S. with appellant and, as a consequence, FCCS was therefore barred from seeking permanent custody of D.S. pursuant to R.C.2151.413(D)(3). Appellant's argument is unpersuasive.
 {¶ 13} R.C. 2151.413(D)(1) provides that a public children services agency shall move for permanent custody of a child "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999[.]"
 {¶ 14} However, according to R.C. 2151.413(D)(3):
An agency shall not file a motion for permanent custody under division (D)(1) or (2) of this section if any of the following apply:
* * *
(b) If reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home.
 {¶ 15} Recently, in In the Matter of: S.P., Butler App. No. CA2004-10-255, 2005-Ohio-1079, the Twelfth District Court of Appeals considered a mother's appeal from a judgment granting permanent custody of her daughter to Butler County Children Services Board ("BCCSB"). Id. at ¶ 1. In her first assignment of error, the appellant asserted that the trial court erred and abused its discretion when it found that BCCSB had made reasonable efforts to prevent removal of the child and terminated parental rights. Id. at ¶ 4.
 {¶ 16} Overruling this assignment of error, the appellate court reasoned:
R.C. 2151.419(A)(1) states that the "reasonable efforts" requirement applies to hearings held pursuant to R.C. 2151.28, R.C. 2151.31(E), R.C. 2151.314, R.C. 2151.33, or R.C. 2151.353. BCCSB filed its motion for permanent custody under R.C. 2151.413, and the juvenile court held a hearing on that motion pursuant to R.C. 2151.414. Therefore, the "reasonable efforts" requirement in R.C. 2151.419(A) was not applicable to this case. * * *
Id. at ¶ 5. See, also, In re A.C., Clermont App. No. CA2004-05-041, 2004-Ohio-5531, at ¶ 30; In re: T.T., Butler App. No. CA2004-07-175, 2005-Ohio-240, at ¶ 11; and R.C.2151.419(A)(1).[4]
 {¶ 17} Here, FCCS filed its motion for permanent custody under R.C. 2151.413, and, pursuant to R.C. 2151.414, the juvenile court held a hearing to consider FCCS's motion. Cf. In theMatter of S.P., at ¶ 5 (wherein BCCSB filed its motion for permanent custody under R.C. 2151.413, and, pursuant to R.C.2151.414, the juvenile court held a hearing to consider BCCSB's motion). However, because R.C. 2151.419 does not apply to R.C.2151.413 or to hearings held pursuant to R.C. 2151.414, the "reasonable efforts" requirement of R.C. 2151.419(A) is inapposite to the facts and circumstances of this case. In theMatter of S.P., at ¶ 5; In re A.C., at ¶ 30; In re: T.T., at ¶ 11.
 {¶ 18} The Supreme Court of Ohio has instructed that "R.C.2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." In re C.W., 104 Ohio St.3d 163,2004-Ohio-6411, at ¶ 9. To award permanent custody requires a two-step approach by a trial court. In the Matter of: G.B.,
Franklin App. No. 04AP-1024, 2005-Ohio-3141, at ¶ 13. First, a trial court must determine whether any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) apply. Id. After a trial court has found that one of the circumstances in R.C. 2151.414(B)(1)(a) through (d) applies, then the trial court must determine by clear and convincing evidence that a grant of permanent custody is in the best interest of the child. Id. at ¶ 14; R.C. 2151.414(B)(1).
 {¶ 19} R.C. 2151.414(B)(1) provides:
Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
* * *
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.
 {¶ 20} Here, according to the evidence, after D.S., who at the time was an adjudicated dependent minor, was removed from the care of his maternal grandfather and stepgrandmother, an emergency care order was issued, and D.S. was placed in a foster care home in April 2002 where he thereafter continuously remained. (Tr. 18-19; 24.) FCCS moved for legal custody in October 2003. Thus, applying R.C. 2151.414(B)(1), we find that D.S. had been in the temporary custody of FCCS for at least 12 months of a consecutive 22-month period prior to FCCS's motion for permanent custody. See In re C.W., at syllabus (holding that "[b]efore a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period").
 {¶ 21} R.C. 2151.414(D) sets forth relevant factors a trial court shall consider when making a permanent custody determination. R.C. 2151.414(D), in relevant part, provides:
In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
For the purpose of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28
of the Revised Code or the date that is sixty days after the removal of the child from home.
 {¶ 22} In support of its motion, FCCS called three witnesses: Atira Haile, D.S.'s FCCS caseworker; Sharon Beckwith, D.S.'s therapist; and Lisa Hitzemann, D.S.'s foster mother. Appellant also testified at the hearing on her behalf.
 {¶ 23} Atira Haile, D.S.'s FCCS caseworker, testified that following the removal of D.S. and his siblings from the maternal grandfather's home in 2002, appellant did not request visitation with her children. (Tr. 28.) Haile testified that appellant first expressed an interest in visiting D.S. in August 2004, id., and that between 2002 and August 2004, Haile did not have any contact with appellant. (Tr. 28-29.) However, Haile later testified that she met with appellant "a couple of times" at appellant's father's home when the children's maternal grandfather and stepgrandmother were still involved in the case. (Tr. 39.)
 {¶ 24} Haile also testified that when she spoke with appellant in August 2004, appellant stated that since 2002 she had been "in and out of jail" and that she was last released in June 2004. (Tr. 33-34.) According to Haile, in December 2004, appellant called Haile for an appointment to visit D.S. (Tr. 35); however, D.S.'s therapist had recommended against visitations by appellant. Id. Also, according to Haile, a court order was later issued to bar any visitation with D.S. by appellant. (Tr. 36.)
 {¶ 25} Appellant testified that she attended one semi-annual review of D.S.'s case plan but failed to attend other semi-annual reviews because she was purportedly incarcerated on the dates of the other semi-annual reviews. (Tr. 108-109.) Appellant also testified that during the period of approximately 1999 to 2004, "I would go to jail, get out of jail, be out, go right back. I mean it was like an ongoing thing for the past five years that I was doing. The last time I got out of jail was August, 2004, is when I got out." (Tr. 94.) Appellant testified that during the two-year period from 2002 to 2004 she was incarcerated approximately five or six times, and that each period of incarceration was approximately three months in duration. (Tr. 96.) Appellant also testified that she previously had been incarcerated related to charges of domestic violence and driving without a valid operator's license. (Tr. 104; 118-119.) Appellant did testify, however, that during the period that her father had custody of her children, she met with a caseworker "a couple of times" at her father and stepmother's house. (Tr. 115.)
 {¶ 26} Accordingly, based upon this evidence, the trial court, as the trier of fact, reasonably could conclude that, due to appellant's repeated incarcerations between 2002 and 2004, appellant was essentially unavailable for reunification efforts by FCCS during this period of time. In her appellate brief, appellant acknowledges that she must bear some of the responsibility for her lack of early involvement in D.S.'s life; however, appellant asserts that after she stabilized her life, she should have been given an opportunity to test D.S.'s reaction to her.
 {¶ 27} Here, according to the evidence, when FCCS moved for permanent custody of D.S., appellant apparently was incarcerated on a recurring basis. Appellant did not inquire about visitation of D.S. until approximately August 2004.
 {¶ 28} When R.C. 2151.414(E)(1)[5] is the basis for granting permanent custody as the initial disposition, an agency must give the parent a case plan and an opportunity to remedy the conditions that caused a child's removal. In re Ward (Aug. 2, 2000), Scioto App. No. 99 CA 2677; In re Lewis, Athens App. No. 03CA12, 2003-Ohio-5262, at ¶ 24 (discussing Ward); In reNibert, Gallia App. No. 03CA19, 2004-Ohio-429, at ¶ 29.
 {¶ 29} However, as the Ward court explained:
* * * An agency need not give every parent an opportunity to correct the situation that caused removal of the child. "It is axiomatic that a parent's statutory right to a reunification plan does not apply in the context of actions seeking permanent custody." The trial court can award permanent custody to a children services agency even though little or no efforts are made to return the child to his or her home if the evidence supports a finding that it is in the child's best interest and the child should not be returned to the parents. * * *
Id. (Citations omitted.) See, also, In re Lewis, at ¶ 23.
 {¶ 30} Here, the grounds for FCCS's permanent custody motion was a claim that D.S. had been in FCCS's custody for 12 or more months of a consecutive 22-month period, not a claim that D.S. could not be placed with either of his parents within a reasonable time. See In re C.W., supra, at ¶ 21 (explaining that after the addition of the "12 of 22" provision to R.C.2151.414 by Am.Sub.H.B. No. 484, 146 Ohio Laws, Part II, 4189, effective March 18, 1999, "an agency need no longer prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months").
 {¶ 31} Thus, because R.C. 2151.414(E)(1) did not serve as a basis for FCCS's effort to seek permanent custody as the initial disposition, FCCS was not under a duty to pursue appellant's reunification with D.S. after it filed its motion for permanent custody of D.S. In re Ward, supra; In re Lewis, at ¶ 23.
 {¶ 32} Furthermore, Haile's testimony and appellant's testimony, if believed by the trier of fact, supports a finding that prior to August 2004 appellant had little contact with Haile. (Tr. 28-29; 115.) In view of such limited contact by appellant during her repeated incarcerations between 2002 and 2004, we cannot conclude that FCCS failed to demonstrate a good-faith effort to implement a case plan involving D.S.'s reunification with appellant. See, generally, In the Matter ofVance, Hancock App. No. 5-03-16, 2003-Ohio-6991, at ¶ 6 (stating that "[o]nce a child has been placed in the temporary custody of a children's services agency, the agency is required to prepare and maintain a case plan for that child"); R.C. 2151.412. See, also, In the Matter of Vance, at ¶ 21, wherein the Third District Court of Appeals observed that:
* * * [Appellant] has cited no case in support of her proposition that a children services agency's duty to make reasonable efforts to reunite a parent with his/her children includes the duty to monitor or evaluate a parent's efforts at reunification during a period of incarceration absent contact by the incarcerated parent to make the agency aware of his/her efforts. Our review of the relevant case law has revealed no support for this proposition either. * * *
 {¶ 33} At the permanent custody hearing, Haile testified that as part of the case plan, appellant was required to complete parenting classes, participate in a drug and alcohol assessment, attend domestic violence counseling, and complete random urine screens. (Tr. 23.) According to Haile, appellant had recently completed the components in her case plan. (Tr. 24.)
 {¶ 34} Appellant testified that she had complied with her case plan. (Tr. 91.) According to appellant, she had completed all parenting classes in December 2004; had completed eight anger management training sessions with three sessions remaining; was attending a weekly GED class, even though her participation in GED classes was not formally included in her case plan; had completed approximately one-half of the GED curriculum; had completed a drug and alcohol assessment; and had participated in urine screenings. (Tr. 91-93; 117.) According to appellant, she had previously used marijuana and drank alcohol (Tr. 119), but denied any current drug usage. Id. Appellant testified that according to the drug and alcohol assessment that she completed, there was no recommendation for any alcohol and drug treatment. (Tr. 91.) Appellant testified that after she completed her anger management program, she intended to attend classes for victims of domestic violence. (Tr. 93.)
 {¶ 35} We find the evidence supports appellant's assertion that she made efforts at stabilizing her life. However, appellant's efforts at stabilizing her life are inescapably intertwined with D.S.'s best interest. We cannot ignore appellant's extended absences during D.S's early years of life and the effects of these absences upon D.S.
 {¶ 36} In In re Christoper (1977), 54 Ohio App.2d 137, the Fifth District Court of Appeals considered an appeal from the termination of a temporary custody order that had the dual effect of returning a child to his natural mother and taking him from his prospective adoptive parents. The Christopher court aptly described the difficult choice a juvenile court is required to make when considering the best interest of a child and the rights of parents. The Christopher court stated:
* * * [T]he natural parent's present status, with respect to present living conditions, financial resources, maturity and emotional stability, is a critical factor, but of first importance is the consideration of the child's best interest. * * * The fact that the natural parent so deprived of his or her child subsequently achieves a status where he or she is found fit to resume the duties of parenthood does not necessarily equate with the child's best interest at that time. The biological parent by tragedy of circumstances, not the least of which is the passage of time, may be unable to cope with the difficult challenge that the resumption of parenthood with the child in question would demand. In short, we find the question of a parent's suitability or fitness is inexorably intertwined with the child's best interest * * *. We view the child's best interest to include as major components the child's psychological and emotional development. By the same token we consider the question of financial or material resources to be substantially less significant. * * * The court is not unmindful of the fact that decisions of this type represent hard choices reminiscent of the dilemma King Solomon faced in biblical times. * * *
Id. at 145-146.
 {¶ 37} Here, as part of its determination, the juvenile court was required to consider the effects appellant's repeated absences from D.S. had upon his psychological and emotional development with appellant's basic civil right to raise a child.
 {¶ 38} Sharon Beckwith, a social worker and counselor at Children's Hospital, who had treated D.S. weekly for approximately two and one-half years (Tr. 49; 51.), and who was qualified as an expert witness by the court (Tr. 49), testified that D.S.'s need for psychotherapy stemmed from D.S.'s victimization by his maternal grandfather and stepgrandmother. (Tr. 59-60.) When queried about her recommendation against appellant's visitation with D.S., Beckwith testified:
* * * Basically the concerns are basically twofold. One is that in [D.S.'s] eyes, you know, he doesn't know who she is, so it's basically introducing a stranger to him. The other concern is that he is very, extremely fearful of [his maternal grandfather and step-grandmother] and anything to do with them, he has a lot of fear and nightmares * * * [and] I'm assuming that [appellant] has a relationship with them and has contact with them, which would mean that he would have the likelihood as well of having contact.
(Tr. 60-61.)
 {¶ 39} However, Beckwith conceded that she never inquired of appellant whether appellant had a relationship with her father and stepmother, and Beckwith did not know whether appellant had a relationship with them. (Tr. 61.) Without objection, Beckwith also testified that she had been told that the maternal grandfather had transported appellant to visits with her daughter. Id.
 {¶ 40} Beckwith further testified that at the beginning of treatment, "[D.S.] had a lot of attention difficulties. He had trouble sitting still. There was a history of him being aggressive with other children, not respecting boundaries." (Tr. 50.) However, Beckwith restated that since treatment began, "[o]verall he's doing much better than he did. I'm not seeing any of the sexual behaviors. I'm not seeing a lot of the anger and aggression at other people and animals that we've had in the past." (Tr. 51.) Beckwith also testified that the current focus of treatment included anger management and the development of coping skills for nightmares. Id. Beckwith testified that following D.S.'s visits with a relative, he expressed self-harm ideation, made threats to take a knife, and exhibited regressive behavior. (Tr. 54.) Beckwith also testified that D.S. had nightmares about being removed from his foster home. Id. According to Beckwith, while D.S. was in preschool, he required speech therapy and special services (Tr. 57); however, these services were no longer required. Id.
 {¶ 41} Beckwith testified that D.S. had bonded with his foster family. (Tr. 55.) According to Beckwith, D.S. identified the foster family as his family and had expressed concern why his last name was not the same as the rest of his foster family. Id. Beckwith testified that, if D.S. were permitted to remain with the foster family, she would expect that he would most likely be able to terminate therapy soon. Id. However, if D.S. were to be moved to another environment, Beckwith testified that she would expect regression and the need for "a lot more" counseling. Id. On re-cross examination, Beckwith also testified that in her expert opinion, if D.S. were placed with appellant, she "would expect a lot of regressive behaviors. I would expect a lot of — all of the behaviors that we were having initially I would expect that to resume, as well as the fear and probably the self-harm thoughts." (Tr. 66.) According to Beckwith, for D.S.'s long-term emotional stability, he would require a structured environment and an environment that is nurturing and free from violence. (Tr. 57.)
 {¶ 42} Beckwith also testified that D.S. identified his foster brother and sister as his siblings and referred to his foster parents as "mom" and "dad" (Tr. 56), and he had expressed a wish to remain with this foster family. (Tr. 57.) According to Beckwith, D.S. did not talk about his biological siblings. (Tr. 56.) When asked whether it would be detrimental to remove D.S. from his foster parents to reunify him with appellant, Beckwith answered affirmatively. Id. Upon cross-examination, Beckwith testified that D.S. had an age-appropriate knowledge of adoption and that he wanted to be adopted. (Tr. 58.)
 {¶ 43} Lisa Hitzemann, D.S.'s foster mother, testified that when D.S. began foster care in her home, he would shove crayons and Lincoln logs in his anus and masturbate with the other hand. (Tr. 69.) Upon his placement in the Hitzemann home, D.S. also demonstrated sexualized play with baby dolls. Id. Consequently, crayons, Lincoln logs, and baby dolls were put away by the foster family. Id. She further testified that D.S. would pull down his pants and masturbate in public. Id. Hitzemann testified that D.S. was "a very frightened little boy; things would make him just cry, he would curl in a corner." Id. Hitzemann testified that D.S. did not like bath time. Id. According to Hitzemann, D.S. "never called out, even when — like at bedtime or if he fell and skinned his knee, he would never cry for — for anyone. You know how most infants will cry, you know, they want their mommy, they want their daddy. He — he was just a lonely little boy." (Tr. 69-70.)
 {¶ 44} Hitzemann also testified about D.S.'s suicidal behavior and mistreatment of his dog and cat when he was aproximately three and one-half to four years old, which was precipitated by his belief that he would be leaving his foster home after visiting his great aunt. (Tr. 72-74.)
 {¶ 45} Hitzemann testified that since D.S. received treatment, he had become a "happy little child." (Tr. 70.) According to Hitzemann, the foster family is comfortable going to church with him now and allowing him to stay with other preschoolers. Id. Hitzemann testified that at school D.S., now a kindergartner, knows how to behave, id., and she has not received any reports of concern from his teachers. (Tr. 71.) According to Hitzemann, D.S. did not engage in sexually deviant behaviors anymore. (Tr. 70.) Hitzemann testified that D.S. enjoyed sports (Tr. 71) and participated in soccer and swimming lessons. Id. Hitzemann also testified that D.S. had bonded with his foster siblings. (Tr. 72.) However, according to Hitzemann, D.S. still exhibited separation anxiety and required reassurance that his foster parents would return for him. (Tr. 70.)
 {¶ 46} When queried about a desire to adopt D.S., Hitzemann testified:
* * * [T]hat would be our hope. He's been with us for three years and he is just — he is just woven so tightly in the family; our immediate family, you know, the both sets of grandparents, aunts, uncles, cousins, the neighborhood, our — you know, family and friends. * * * For a little five-year old child who's been there for three years, I can't imagine what he would think to finally not be part of — part of our family. * * * And I think it's because he's had no visitation. He's been with our family for three years with no visitation. So it's not as if there's been any type of interaction with another family.
(Tr. 76-77.)
 {¶ 47} Here, based upon the evidence, we cannot conclude that the trial court erred when it determined that, by clear and convincing evidence, it was in D.S.'s best interest that FCCS should be given permanent custody of D.S. Although appellant made strides at stabilizing her life, such efforts must be considered in conjunction with D.S.'s psychological and emotional development. In re Christopher, supra, at 145. Here, by tragedy of circumstances, not the least of which was appellant's absence during the early years of D.S.'s life, and the passage of time, appellant made strides to stabilize her life after D.S. had developed an attachment with his foster family.
 {¶ 48} For the foregoing reasons, we hold that there is some competent, credible evidence to support the trial court's judgment that by clear and convincing evidence it was in D.S.'s best interest to permanently commit him to the custody of FCCS, and, therefore, appellant's sole assignment of error is not well-taken.
 {¶ 49} For the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
French and Travis, JJ., concur.
[1] To protect anonymity, we will use initials for the last name of the parents and for the first and last name of the minor child.
[2] On October 15, 2003, the children's paternal grandmother moved for legal custody of D.S.'s siblings. At the request of the children's paternal grandmother, this motion was later dismissed. On December 29, 2003, FCCS moved the trial court to place D.S.'s older siblings in a planned permanent living arrangement, claiming that these children were unable to function in a family setting. By agreement, legal custody of D.S.'s older sister was later granted to the paternal grandmother; custody of D.S.'s older brother was granted to appellant conditioned upon a favorable home study and in conjunction with an order of protective supervision; and FCCS's motion for a planned permanent living arrangement for D.S.'s older siblings was to be dismissed. (Tr. 7-11.) However, on February 28, 2005, FCCS later moved for permanent custody of D.S.'s older brother.
[3] According to the evidence, D.S.'s paternal grandmother apparently questioned whether her son was D.S.'s father. (Tr. 32.) However, according to the testimony of an FCCS caseworker, Charles S. stated a belief that he was D.S.'s father. Id.
[4] R.C. 2151.419(A)(1), in relevant part, provides:
Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. * * *
[5] R.C. 2151.414(E) provides:
In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determined, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.