OPINION
{¶ 1} Appellant, L.H., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating all parental rights and granting permanent custody of her son, V.H., to Franklin County Children Services ("FCCS"). Because the trial court's decision is supported by sufficient, competent, and credible evidence, we affirm the judgment of the trial court.
 {¶ 2} V.H. was born on May 6, 2003, at The Ohio State University Medical Center in Columbus, Ohio. At the time of his birth, the presence of cocaine allegedly was detected in V.H. and in appellant. Claiming that V.H. was an abused, neglected, and dependent child and that the whereabouts of V.H.'s biological father were unknown, FCCS subsequently sought temporary custody or, in the alternative, permanent custody of V.H. Thereafter, the trial court, through a magistrate, issued an order placing V.H. in the temporary custody of FCCS. Following his birth, V.H. was placed in a foster care home.
 {¶ 3} After having found that V.H. was an abused, neglected, and dependent child, the trial court made V.H. a ward of the court and ordered FCCS to have continued temporary custody of V.H. FCCS later moved for permanent custody of V.H and sought termination of all parental rights.
 {¶ 4} The trial court appointed a guardian ad litem for V.H. and an attorney to represent appellant. Upon the motion of appellant's attorney, the trial court also appointed a guardian ad litem for appellant.
 {¶ 5} After conducting a hearing to consider FCCS's motion for permanent custody of V.H., by clear and convincing evidence the trial court found that V.H. could not be placed with either parent within a reasonable time, or that he should not be placed with his parents in the foreseeable future; V.H.'s return to his parents' home would be contrary to his best interests and welfare; and it was in V.H.'s best interest to permanently commit him to the custody of FCCS. The trial court therefore granted permanent custody of V.H. to FCCS for the purpose of arranging an adoption, and the trial court also terminated all parental rights. From the trial court's judgment, appellant appeals.
 {¶ 6} Appellant assigns a single error for our consideration:
THE TRIAL COURT ERRED WHEN IT DETERMINED THAT PERMANENT CUSTDOY OF [V.H.] SHOULD BE GRANTED TO FRANKLIN COUNTY CHILDREN SERVICES.
 {¶ 7} The right to raise a child is a basic and essential civil right. In the Matter of: J.Z., Franklin App. No. 05AP-8,2005-Ohio-3285, at ¶ 9, citing In re Hayes (1997),79 Ohio St.3d 46, reconsideration denied, 79 Ohio St.3d 1492. Accordingly, a parent must be given every procedural and substantive protection that the law allows prior to the termination of parental rights. Id. See id. at 48 (stating that "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' Therefore, parents `must be afforded every procedural and substantive protection the law allows.'") (Citations omitted.)
 {¶ 8} "[T]o terminate parental rights, the movant must demonstrate by clear and convincing evidence that (1) termination is in the child's best interests, and (2) one of the four factors enumerated in R.C. 2151.414(B)(1) applies." In the Matter of:J.Z., at ¶ 10, citing In re Gomer, Wyandot App. No. 16-03-19,2004-Ohio-1723, appeal not allowed, 102 Ohio St.3d 1473,2004-Ohio-2830. "Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." In the Matter of: J.Z., at ¶ 10, citing In reAbram, Franklin App. No. 04AP-220, 2004-Ohio-5435, appeal not allowed, 104 Ohio St.3d 1441, 2004-Ohio-7033. However, "[clear and convincing evidence] does not mean clear and unequivocal evidence and does not require proof beyond a reasonable doubt."In the Matter of: J.Z., at ¶ 10. "An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." In the Matter of Siders (Oct. 29, 1996), Franklin App. No. 96APF04-413, citing In re Brofford
(1992), 83 Ohio App.3d 869, 876-877; In re Hiatt (1993),86 Ohio App.3d 716, 725, motion to file notice of appeal instanter denied, 67 Ohio St.3d 1406. See, also, In re Nibert, Gallia App. No. 03CA19, 2004-Ohio-429, at ¶ 15-16.
 {¶ 9} "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." In re C.W.,104 Ohio St.3d 163, 2004-Ohio-6411, at ¶ 9. To award permanent custody requires a two-step approach by the trial court. In the Matterof: G.B., Franklin App. No. 04AP-1024, 2005-Ohio-3141, at ¶ 13 (Sadler, J., dissenting). First, a trial court must determine whether any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) apply. Id. After a trial court finds that one of the circumstances in R.C. 2151.414(B)(1)(a) through (d) applies, then the trial court must determine by clear and convincing evidence whether a grant of permanent custody is in the child's best interest. Id. at ¶ 14; R.C. 2151.414(B)(1). See, also, In theMatter of: S.S., Franklin App. No. 05AP-204, 2005-Ohio-4282, at ¶ 18.
 {¶ 10} R.C. 2151.414(B)(1) provides, in relevant part:
Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 11} R.C. 2151.414(D) sets forth relevant factors that a trial court shall consider when determining the best interest of a child at a permanent custody hearing. R.C. 2151.414(D) provides, in relevant part:
In determining the best interest of a child at a hearing pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 12} At the outset, FCCS concedes that V.H. was not in the custody of FCCS for 12 months of a consecutive 22-month period at the time that FCCS moved for permanent custody. See, generally,In re C.W., supra, at syllabus (holding that "[b]efore a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period"). However, FCCS asserts that the trial court did not err by terminating all parental rights and by placing V.H. in permanent custody of FCCS.
 {¶ 13} At the hearing wherein FCCS's motion for permanent custody was considered, FCCS called two witnesses: appellant and Ms. Tamella Fair, an FCCS caseworker. Appellant also testified at the hearing on her own behalf.
 {¶ 14} Appellant testified that since February 2004 she had been jailed at the Franklin County Corrections Center II. (Tr. 5.) Appellant testified that she was jailed for "six specs — specs — gun specs, it got dropped to a felony five" (Tr. 23) and she had pled guilty to these charges. (Tr. 24.)
 {¶ 15} Prior to this incarceration, appellant had been homeless and lived with others with whom she became acquainted. (Tr. 5.) In addition to V.H., appellant has three other children, who live in Pennsylvania. (Tr. 5-6.) Appellant testified that "[she] was incarcerated since 13 years and [she] came here to Marysville" and that her older son was seven years old when she was previously incarcerated and her youngest daughter was eight months old at that time. (Tr. 6-7.)
 {¶ 16} Appellant admitted that after giving birth to V.H., she left the hospital without him. Appellant testified:
* * * I left OSU, I mean, yes, OSU Hospital because I was in there for use of drugs and the nurse thought it would be appropriate if I explained why — she thought I had dope in me and I explained that I was using, so she told the — some — some lady came in to see me; I don't know who she was. She said she was a supervisor of the staff there so it was appropriate for the lady to tell (inaudible) a child under the influence of drugs.
(Tr. 7-8.)
 {¶ 17} Appellant also admitted that prior to leaving the hospital she did not give permission for a birth certificate or for circumcision of V.H. (Tr. 8.) Appellant further admitted that, while she was pregnant with V.H., she smoked crack. (Tr. 9.) Appellant conceded that during her pregnancy she did not have an obstetrician whom she saw for regular prenatal care; rather, she sought some prenatal care through church-affiliated doctors and through emergency room visits. (Tr. 9-10.) Appellant also conceded that since the day of V.H.'s birth, she had not seen V.H, although she had requested pictures of him. (Tr. 25-26.)
 {¶ 18} Appellant testified that during her pregnancy she lived in homeless shelters and later appellant resided with a man who permitted appellant to stay with him. (Tr. 10-11.) Appellant disputed whether she failed to attend a supervised meeting at FCCS that was scheduled for approximately two weeks after V.H.'s birthday. (Tr. 15-17.) Appellant also disputed that she failed to contact FCCS for another 14 months or until June 2004 to inquire about V.H.'s welfare. (Tr. 19-21.)
 {¶ 19} Appellant testified that she had previously received mental health and substance abuse treatment at Twin Valley psychiatric facility. (Tr. 17-19.) According to appellant, she has been diagnosed with bipolar disorder and antisocial personality disorder. (Tr. 25, 59.) Appellant admitted that she had never participated in any parenting classes. (Tr. 26.)
 {¶ 20} On direct examination, Tamella Fair, an FCCS caseworker, testified that V.H.'s case had been assigned to her on March 24, 2004. (Tr. 29.) According to Ms. Fair, the previous caseworker had informed her that she had spoken with appellant approximately two or three times following V.H.'s discharge from the hospital, but that since these initial contacts, the former caseworker had no other contact with appellant. (Tr. 30.) Ms. Fair testified that when she first received V.H.'s case, she did not know appellant's whereabouts. (Id.) However, in June 2004, Ms. Fair received a letter from appellant informing her of appellant's incarceration. (Tr. 30-31.) According to Ms. Fair, in July 2004, Ms. Fair received a telephone call from appellant, wherein appellant informed her that she was hospitalized at Twin Valley psychiatric facility and that she would be discharged soon. (Tr. 31.) Because permanent custody litigation had commenced, Ms. Fair directed appellant to speak with her attorney. (Tr. 31-32.)
 {¶ 21} Ms. Fair testified that, according to objectives in the case plan, appellant was required: (1) to meet V.H.'s basic needs; (2) to comply with a high-risk infant protocol; (3) to complete parenting classes; (4) to complete a drug and alcohol assessment and follow any recommendations; (5) to complete a mental health assessment and follow any recommendations; (6) to find employment and housing; and (7) to submit proof of housing. (Tr. 32.)
 {¶ 22} Ms. Fair testified that she was unable to make any referrals related to case-plan objectives because, during the time that V.H.'s case had been assigned to her, appellant had been either incarcerated or hospitalized at Twin Valley psychiatric facility. (Id.) According to Ms. Fair, under the case plan, appellant was permitted weekly supervised child visitations at FCCS, and, to her knowledge, appellant failed to participate in any visitations. (Tr. 33.)
 {¶ 23} Ms. Fair further testified that, as a result of being born with cocaine in his system, V.H. has experienced some physical and cognitive delays, for which V.H. receives physical therapy and speech therapy. (Id.) Ms. Fair also testified that because V.H. has failed to gain weight adequately, a medical regimen had been developed to address this issue. (Id.)
 {¶ 24} Ms. Fair testified that V.H. was attached to his foster parents and his foster siblings. (Tr. 34.) According to Ms. Fair, V.H.'s foster family was also a potential adoptive placement and that a grant of permanent custody to facilitate an adoption would benefit V.H. (Tr. 34-35.) Ms. Fair also testified that V.H.'s foster mother stayed at home and she was capable of taking care of V.H., as well as her own children. (Tr. 48.) Ms. Fair also testified that FCCS investigated placing V.H. with his maternal grandmother; however, due to the maternal grandmother's age and poor health, such placement was not arranged. (Tr. 35.)
 {¶ 25} On cross-examination, Ms. Fair testified that she did not arrange any child-visitation appointments at the jail or the psychiatric facility because "[she] did not think that would be in [V.H.'s] best interest to visit her at jail and she did not ask for any visits either when I spoke to her the one time." (Tr. 37.) Ms. Fair further testified that she did not think it was in V.H's best interest to visit appellant because "[s]eeing that [V.H.] is not bonded to her, no, and being of his age." (Id.) Ms. Fair conceded, however, that child visitation was a case-plan objective that had been adopted by the court, FCCS had never petitioned the court to change this case-plan objective; and, by not following this objective, FCCS had failed to follow a court order. (Tr. 38.)
 {¶ 26} On cross-examination, appellant's attorney asked Ms. Fair to discuss her efforts at following events in appellant's life. Ms. Fair testified:
When I got her letter of June '04, I called the jail to see when her release date was. They said they did not know. Then I called the following week and they told me she was at Twin Valley. No, I'm sorry, they told me that she was out receiving treatment. And then she called me and told me she was Twin Valley. [sic] And then, I'm sorry — when they told me she was out for treatment they told me she would be back. But then she calls me and told me she was at Twin Valley receiving services and that she wouldn't be going back to jail and that she would be getting out of Twin Valley. And that's when I had told her she may need to speak with her attorney because we were in the middle of a PCC trial. She never called me back after that, and so then I did call Jackson Pike again and they told me that she was back, and then again they told me she did not have a release date they just told me of her next court hearing.
(Tr. 39-40.)
 {¶ 27} Ms. Fair also testified that she has not arranged a drug and alcohol assessment for appellant because "[i]n order for her to do a drug or alcohol assessment she would have to be out of jail to get to get [sic] that assessment where we would complete it where we have our contract (inaudible). I don't know of any other way if she's incarcerated to do that." (Tr. 41.) Upon further cross-examination, Ms. Fair conceded, however, that she did know whether the agency that performed drug and alcohol assessments for FCCS evaluated clients in a jail setting. (Tr. 42.) Ms. Fair also conceded that she failed to investigate whether parenting classes were offered at the jail or psychiatric facility. (Tr. 45.) Ms. Fair also conceded that she had not received information that appellant's mental health issues would necessarily preclude appellant from raising V.H.; that she did not have information concerning whether appellant had used drugs in over a year; and, that, during the time that Ms. Fair had been assigned to V.H.'s case, FCCS had not attempted to implement the case plan. (Tr. 41, 47.)
 {¶ 28} Ms. Fair testified that appellant had requested a picture of V.H. However, even though an FCCS supervisor agreed that FCCS could provide appellant with a picture, Ms. Fair testified that she did not send a picture to appellant because the foster parents did not have a picture of V.H. at the time. (Tr. 43-44.)
 {¶ 29} On direct examination, appellant testified that for the last 13 months she had no access to illegal drugs or alcohol and she had not ingested any illegal drugs or alcohol. (Tr. 53.) Appellant also testified that from February 11, 2004, until the date of the permanent custody hearing, she had either been incarcerated or hospitalized at Twin Valley psychiatric facility. (Tr. 52.) Appellant testified that she was discharged from the psychiatric hospital on August 30, 2004, because:
* * * I have a case with someone there and it was interfering with my treatment. I was there to be found competent and I didn't get all my competency hearings done so I had to be discharged.
(Tr. 53.) Appellant testified that she had not been found competent and explained that:
* * * I have had hearings but still the judge had met me because he seen that I was going through drug treatment in facility of Jackson Pike, they do have a drug treatment there. I've been participating in the Path classes and I've been going through a little NA, so I've rededicated my life to myself and my child, trying to.
(Tr. 54.)
 {¶ 30} On cross-examination, appellant's counsel inquired whether appellant had participated in the lives of her three older children. Appellant testified:
My oldest son I raised him until he was seven. I had done things with him, took him places, carnivals, things like that; showing him how to cook and things like that. My oldest — I mean my youngest and middle daughter, no not really. I — I can't say that cause I was in jail for 13 years straight.
(Tr. 56.) Until the time of her 13-year incarceration when her son was seven years old, appellant denied any involvement with a children services agency. (Tr. 57.)
 {¶ 31} Appellant disputed a characterization that she abandoned V.H. at the hospital following his birth, claiming that hospital staff did not permit appellant to take V.H. with her when she left the hospital. (Tr. 58.)
 {¶ 32} On cross-examination by her guardian ad litem, appellant admitted that in the past, jail staff had accused appellant of hoarding a prescribed medication and that, at the time of the hearing, because of the hoarding allegation, her physician discontinued prescribing the medication for appellant. (Tr. 60.)
 {¶ 33} On cross-examination by V.H.'s guardian ad litem, appellant testified that most of her adult life has been spent in jail and that during her life she has never held a job that paid even minimum wage. (Tr. 64.) Appellant conceded that on one previous occasion, after being released from jail, appellant violated probation and was re-incarcerated. (Id.) Appellant also conceded that her children's maternal grandmother had mostly raised appellant's older children. (Id.) However, according to appellant, her mother is now "very sickly" and she has "cancer" and receives radiation treatments. (Tr. 69.)
 {¶ 34} When queried how she would support herself following her release from jail, appellant testified that she would seek employment in the field of culinary arts, as she took up culinary arts in jail and enjoyed it. (Tr. 65.) Appellant also testified that while she was incarcerated in Pennsylvania from 1989 to 2002, she "did custodial work, maintenance, learned how to take motors out of cars, but my most job [sic] was Culinary Arts, to learn how to cook in the kitchen." (Tr. 71.)
 {¶ 35} Appellant also testified that she previously felt that living in Columbus, Ohio, might not be safe for her or V.H. because she witnessed domestic violence against a friend, and she was concerned the alleged perpetrator would attempt to harm her. (Tr. 67.) Appellant expressed an interest in returning to Farrell, Pennsylvania, to live with her mother who lives in subsidized housing. (Tr. 71-72.)
 {¶ 36} Based upon our review of the evidence, we cannot conclude that there is insufficient competent, credible evidence to support the trial court's judgment.
 {¶ 37} In its March 25, 2005 judgment entry, the trial court held:
Based on clear and convincing evidence, pursuant to O.R.C.2151.414(D)(E), the Court finds that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent in the foreseeable future. The child's continued residence in or return to the home would be contrary to the child's best interests and welfare. It is in the best interest of the child to permanently commit the child to Franklin County Children Services.
See, generally, R.C. 2151.414(D) (providing that "the court shall consider all relevant factors" when determining the best interest of a child at a permanent custody hearing) and (E) (providing that "the court shall consider all relevant evidence" at a permanent custody hearing when determining whether a child cannot be placed with either parent within a reasonable time or whether a child should not be placed with the parents).
 {¶ 38} Here, after service of process by publication, V.H.'s biological father did not participate in the permanent custody proceedings. Furthermore, according to the record, V.H.'s biological father had not been involved in V.H.'s case before the juvenile court. Thus, due to V.H.'s biological father's absence, a trial court reasonably could conclude that V.H. could not be placed with his biological father.
 {¶ 39} At the time of the permanent custody hearing, appellant had been incarcerated or hospitalized since February 2004. Furthermore, at the hearing, appellant conceded that most of her adult life had been spent in jail and that her mother, who was now ill with cancer, mostly raised appellant's older children.
 {¶ 40} Based upon the testimony of Ms. Fair, an FCCS caseworker, shortly after V.H.'s birth in May 2003, FCCS appears to have had two or three contacts with appellant, including an unsuccessful attempt at arranging a child-visitation session. Ms. Fair further testified that at the time V.H.'s case was assigned to her in March 2004, she did not know appellant's whereabouts. Based upon this evidence and reasonable inferences drawn from this evidence, the trial court reasonably could conclude that, except for these two or three contacts shortly after V.H.'s birth, appellant did not regularly support, nor did she regularly attempt to visit V.H. during the time following V.H.'s birth until appellant's incarceration in February 2004.
 {¶ 41} No expert testimony was offered concerning appellant's psychiatric condition or whether appellant's psychiatric condition limited, if at all, appellant's ability to parent V.H. However, appellant testified that she previously had been diagnosed with bipolar disorder and antisocial personality disorder and that she had previously been treated with medications for these disorders. Appellant also admitted to using crack cocaine during her pregnancy with V.H. Moreover, at the time of V.H.'s birth, the presence of cocaine apparently was detected in V.H. and appellant. Because appellant admitted to crack cocaine use while pregnant with V.H., thereby endangering her unborn child, the trial court reasonably could have questioned the adequacy of appellant's parental judgment.
 {¶ 42} Appellant asserts that FCCS failed in its obligation to provide services to appellant and failed to provide child visitation as required by the court-approved case plan. In addition, appellant asserts that the evidence does not support a finding that she could not be prepared to parent V.H. in a reasonable period of time.
 {¶ 43} Here, according to Ms. Fair's testimony, FCCS unsuccessfully attempted to arrange a child visitation shortly after V.H.'s birth. Moreover, except for a few contacts shortly after V.H.'s birth, Ms. Fair's testimony supports a conclusion that appellant had no further contact with FCCS until June 2004, after FCCS moved for permanent custody.
 {¶ 44} In In re Ward, Scioto App. No. 99 CA 2677, the court observed that "`[i]t is axiomatic that a parent's statutory right to a reunification plan does not apply in the context of actions seeking permanent custody.' "Id. quoting In re Cooperman (Jan. 19, 1995), Cuyahoga App. No. 67239, citing In re Pachin (1988),50 Ohio App.3d 44, 47-48, cause dismissed, 39 Ohio St.3d 720. As the Ward court observed: "The trial court can award permanent custody to a children services agency even though little or no efforts are made to return the child to his or her home if the evidence supports a finding that it is in the child's best interest and the child should not be returned to the parents." Id. citing In re Scott (Aug. 22, 1997), Marion App. No. 9-97-N, citing In re Stevens (July 16, 1993), Montgomery App. No. 13523.
 {¶ 45} In this case, Ms. Fair conceded that she failed to provide child visitation as required by the court-approved case plan. However, because permanent custody proceedings had already been implemented at the time appellant contacted Ms. Fair in June 2004 and because Ms. Fair did not know appellant's whereabouts prior to June 2004, we cannot conclude that Ms. Fair's apparent lack of diligence in implementing the case plan constitutes reversible error.
 {¶ 46} Moreover, we cannot conclude that the trial court erred when it found that appellant could not be prepared to parent V.H. in a reasonable period of time. At the time of the hearing, appellant was incarcerated, and it was unknown when appellant would be released from jail. In his closing argument, appellant's counsel represented that appellant was scheduled to be sentenced in two weeks from the date of the permanent custody hearing and that there was a strong possibility that appellant would be sentenced to "Liberty House." Such argumentation, however, was speculative. Furthermore, by her own admission, appellant conceded that her mother had mostly raised her older children. Thus, because appellant's mother had mostly raised appellant's older children, the trial court reasonably could have doubts about appellant's preparedness to parent a small child who had special needs or whether appellant could be prepared to parent a small child with special needs within a reasonable period of time. Therefore, under these facts and circumstances, we cannot conclude that the trial court erred by finding that V.H. could not be placed with appellant within a reasonable time.
 {¶ 47} Finally, we cannot conclude that the trial court erred when it determined that, by clear and convincing evidence, it was in V.H's best interest that FCCS should be given permanent custody of V.H. Here, V.H.'s foster family expressed an interest in adopting V.H. and V.H. had developed an attachment to his foster family. By tragedy of circumstances, appellant was absent during the early months of V.H.'s psychological and emotional development. Under these facts and circumstances, we find that the trial court reasonably could conclude that by clear and convincing evidence it was in V.H.'s best interest to be permanently placed with FCCS for the purpose of arranging a permanent home that offered stability, consistency, and regularity.
 {¶ 48} Accordingly, for the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is therefore affirmed.
Judgment affirmed.
Brown and McGrath, JJ., concur.