[Cite as *In re AJ*, 2016-Ohio-248.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

IN RE:

    A.J.                                   CASE NO.  3-15-12

ADJUDGED NEGLECTED CHILD.

[BRITTANY C. JOHNSON –                   O P I N I O N
    APPELLANT].

Appeal from Crawford County Common Pleas Court
Juvenile Division
Trial Court No. F2145134

Judgment Affirmed

Date of Decision:   January 25, 2016

APPEARANCES:

    *Geoffrey L. Stoll*  for Appellant, Brittany C. Johnson

    *Michael J. Wiener*  for Appellee, Crawford County JFS

    *Brian N. Gernert*  for Appellee, Brian K. Schultow

**ROGERS, J.,**

{¶1} Appellant, Brittany Johnson ("Brittany"), appeals the judgment of the Court of Common Pleas of Crawford County, Juvenile Division, granting permanent custody of her minor child, A.J., to the Crawford County Department of Job and Family Services ("CCDJFS"). On appeal, Brittany argues that (1) CCDJFS did not make a good faith effort to reunify parent and child and (2) the trial court's decision was not supported by clear and convincing evidence. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On July 22, 2014, CCDJFS filed a complaint in the Court of Common Pleas of Crawford County, Juvenile Division, alleging that A.J. was a neglected child pursuant to R.C. 2151.03(A)(2). The complaint stemmed from the fact that Brittany gave birth to A.J. while serving a 4 year and 11 month prison sentence.

{¶3} Later that day, a shelter-care hearing was held, and CCDJFS was granted temporary custody of A.J.

{¶4} On August 4, 2014, A.J.'s maternal grandmother, Shari Johnson ("Shari"), and A.J.'s maternal great-grandmother, Joanna Johnson ("Joanna"), filed a motion to intervene seeking temporary custody of A.J. or, in the alternative,

visitation rights.[1]  The State filed its response, claiming that both Shari and Joanna

were unfit to care for A.J.  In its response, the State stated that

> [t]he agency ha[s] knowledge of * * * [Shari] as she previously had
> involvement with [CCDJFS] or its predecessor agency, the Crawford
> County Children's Services Board. In 1995 through Case Nos.
> C955578 / C955579 / C95580 / C95581, [Shari's] children were
> found to have been in a neglected / dependent condition.  In 2011,
> through Case No. C2115109, [Shari's] child was found to have been
> in a neglected condition.  [Shari] was also listed as the alleged
> perpetrator in additional substantiated neglect cases with the agency.
> Based upon the prior adjudications alone, a home-study evaluation
> on [Shari] would not pass.
>
> CCDJFS did initiate a home-study evaluation of [Joanna,] at the
> mother's request for possible placement.   Based upon the
> investigation conducted by the caseworker, [Joanna] did not pass the
> home-study evaluation as there is a registered sex-offender * * *
> residing in the residence, additionally [Joanna] was listed as the
> alleged perpetrator in a substantiated neglect case with the agency.
>
> Related to the within proceedings, but not necessarily the home-
> study evaluation, [Joanna,] during a previous child-welfare
> proceeding, indicated that due to her health and various personal
> reasons, as well as her inability to take the child to various
> appointments, she was unable to care for said child and asked that
> said child be removed from her custody. Said child was thirteen (13)
> at the commencement of the companion case.   Considering the
> potential specialized medical needs of [A.J.] if [Joanna] was not able
> to care for a thirteen (13) year old, and take her to all of her various
> appointments, she certainly would not be in a position to provide the
> necessary care for [A.J.], [an] infant.

(Docket No. 7, p. 2-3).  By entry dated February 5, 2015, the trial court denied the

Johnsons' motion.

---

[1] In the Johnsons' motion to intervene, Shari is identified as A.J.'s maternal aunt and Joanna is identified as A.J.'s maternal grandmother.  In reviewing the record, it appears, in fact, that Shari is A.J.'s maternal grandmother and Joanna is A.J.'s maternal great-grandmother.

{¶5} On August 18, 2014, a hearing was held on the complaint, and the trial court found, by clear and convincing evidence, that A.J. was neglected pursuant to R.C. 2151.03(A)(2).

{¶6} The following month, CCDJFS opened a home study, through the Interstate Compact on the Placement of Children ("ICPC"), on A.J.'s father, Brian Schultow, who was living in Pennsylvania.

{¶7} On October 10, 2014, a dispositional hearing was held. Based on Schultow's desire to be considered as a placement for A.J., CCDJFS established a case plan for Schultow setting forth the following objectives: (1) obtain and maintain a stable hazard-free residence for himself and A.J. for at least 90 days; (2) maintain income to ensure that he will be able to meet all of A.J.'s basic needs; (3) sign all requested releases of information; and (4) cooperate with CCDJFS and case plan goals. These objectives stemmed from the fact that Schultow was recently released from prison and was living in a half-way house.

{¶8} By entry dated October 20, 2014, the trial court approved and adopted CCDJFS's case plan.

{¶9} On January 22, 2015, CCDJFS filed its semiannual administrative review report. In its report, CCDJFS stated that Schultow had made insufficient progress toward meeting his case plan objectives. The report stated, in relevant part:

[Schultow] does have employment. He does not have any cognitive or physical delays. * * * It is unclear how [Schultow] and [Brittany] view their own strength and problem areas as they have little to no contact with the agency. Worker did request an ICPC home study from Dauphin County Child and Youth in Pennsylvania for [Schultow] at his new address; worker has not yet received any results of this home study. [Schultow] did not show up for his visit with [A.J.] that was scheduled for 10/10/14 at 1pm. [Schultow] has not fully cooperated with the ICPC home study as he has not obtained a physical exam which is needed to complete the home study.

[Schultow] reports that he has an apartment; however, there has been no verification of this through ICPC in Pennsylvania. The amount of his income is unknown; therefore, it is unclear if he has sufficient income to support an infant, including daycare, while he works. [Schultow] has not fully cooperated with the ICPC parent home study. He has never met [A.J.], who will be six months old on January 22, 2015. [Schultow] scheduled two visits with his daughter in the last six months and did not attend either visit.

(Docket No. 20, p. 4).

{¶10} Based on this information, on January 29, 2015, the State filed a motion for permanent custody, pursuant to R.C. 2151.413, and a hearing was set for April 13, 2015.

{¶11} Thereafter, Brittany sent a letter to the trial court insisting that A.J.'s great-aunt, Jodi Johnson ("Jodi"), care for A.J.

{¶12} On April 3, 2015, the State filed a motion to continue. In its motion, the State explained that

[CCDJFS] just received the ICPC home study evaluation for [Schultow], which approved his prior place of residence. An additional home-study evaluation is now required of [Schultow] as

he has changed his residence since the original evaluation was completed. Furthermore, despite the demonstrated lack of commitment to [A.J.] by his failing to ever visit the child, in order to allow [Schultow] the opportunity to develop a bond with the child such that it might become appropriate to place [A.J.] with [Schultow], a short continuance is necessary herein.

(Docket No. 36, p. 1). The hearing was rescheduled for May 26, 2015.

{¶13} On May 26, 2015, A.J.'s guardian ad litem filed a report recommending that permanent custody of A.J. be awarded to CCDJFS. In support, A.J.'s guardian ad litem noted that Schultow had neither met A.J. nor been cooperative with CCDJFS.

{¶14} That same day, a permanent custody hearing was held. When Schultow failed to appear, his attorney offered the following explanation:

Obviously, I have tried to send mail to him. Most – well, all of those letters have been returned since our last hearing date. I tried at multiple addresses and was unable to get anything through to him. I have spoken to him on the telephone and kind of explained the situation. Obviously, for whatever reason, I have not been able to speak to him as of late, but I'm sure that had he been able to be here, he would have been here today.

May 26, 2015 Hrg., p. 10.

{¶15} The hearing proceeded, and the State called Sue Bauer, foster care and adoption coordinator at CCDJFS, as its sole witness.

{¶16} Bauer testified that CCDJFS obtained temporary custody of A.J. in July 2014, after Brittany gave birth to A.J. while incarcerated. She explained that,

-6-

prior to placing A.J. in foster care, CCDJFS opened a home study on several of Brittany's relatives in hope of finding a suitable relative placement for A.J.

{¶17} Bauer stated that during Joanna's home study, CCDJFS learned that a registered sex-offender was living in the home. Moreover, the living conditions were unfit for a child—Joanna's home consisted of the upper level of a beauty salon and lacked basic resources. For these reasons, Joanna was not approved as a relative placement for A.J.

{¶18} Bauer stated that during Jodi's home study, CCDJFS learned that she had been previously charged with child endangering in January 2002. Additionally, at the time of the home study, Jodi lacked income. For these reasons, Jodi was not approved as a relative placement for A.J., and ultimately, A.J. was placed in foster care.

{¶19} Bauer stated that a few months later, in September 2014, CCDJFS opened a home study on Schultow through ICPC, but by January 2015, CCDJFS had not received a finalized report from ICPC demonstrating Schultow's ability to care for A.J. According to Bauer, CCDJFS requested information from ICPC, but ICPC did not respond. As a result, CCDJFS closed Schultow's home study in late January 2015.

{¶20} Although Bauer acknowledged that a home study can take up to one year to complete, she stated that Schultow's home study was closed because "it

took so long for [ICPC] to complete it and we needed permanency for the child." May 26, 2015 Hrg., p. 28. She added that "[Schultow] was free to work on his case plan and visit his child and so on. He did not do that." *Id*. at p. 30.

{¶21} Bauer admitted that shortly thereafter, in early February 2015, she received a finalized report from ICPC indicating that Schultow's residence had been approved and that he could meet A.J.'s day-to-day needs, including food and child-care. The report showed that Schultow had numerous contacts with Jewish Social Services, the agency conducting Schultow's home study, between September 2014 and January 2015 and concluded that "Mr. Schultow would be considered as a permanent resource for [A.J.] as long as he can show proof of residency, stability, at the time of placement." *Id.* at p. 31. Bauer added, however, that the report failed to include verification of Schultow's income.

{¶22} Upon receiving this report, Bauer stated that CCDJFS did not reopen Schultow's interstate home study because "since [February 2015], [Schultow] had not remained stable enough in his living environment for us to have any idea whether we would ever open another one." *Id.* at p. 39. In fact, Bauer added that she currently did not have a valid address for Schultow.

{¶23} Bauer stated that CCDJFS's goal was to achieve permanency for A.J., who had been in foster care since birth. She acknowledged that from the case's inception, CCDJFS believed that A.J. would be placed for adoption.

**{¶24}** According to Bauer, A.J. had bonded with her foster parents, who had been caring for her since she was three days old. She explained that

> [A.J.'s] a happy baby. She's starting to crawl around and play with the dog. [A.J.'s foster parents] take her to church and to their family's functions and they have a large circle of support within their family and the church family also. * * * At a recent visit, the foster parent got up and walked around the corner to get something, and [A.J.] began to wimper [sic] and started crawling after her, because she was worried about her being out of her eyesight.

*Id.* at p. 19-20.

**{¶25}** By entry dated June 23, 2015, the trial court granted permanent custody to CCDJFS. In doing so, the trial court made the following findings:

> From all the information presented, the court finds by clear and convincing evidence that the child should not or could not be placed with either parent because [Brittany] will be incarcerated and not be available to care for the child for more than eighteen months as provided in O.R.C. Sec. 2151.414(E)(12) and that [Schultow] has continuously failed to substantially remedy the conditions causing the child to be placed outside the home and has demonstrated a lack of commitment toward the child as provided in O.R.C. Sec. 2151.414(E)(1) and (4); and that this situation is not likely to improve in the near foreseeable future as provided in O.R.C. Sec 2151.414(B)(2); that there are no suitable and appropriate family members or relatives to assume long-term placement of the child; and that considering the factors established in O.R.C Sec. 2151.414(D) that it would be in the best interests of the child to grant permanent custody to the public child caring agency.

(Docket No. 44, p. 8).

{¶26} It is from this judgment that Brittany appeals, presenting the following assignments of error for our review.[2]

### Assignment of Error No. I

**CRAWFORD COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES DID NOT ACT IN GOOD FAITH / MAKE A GOOD FAITH EFFORT TO REUNIFY PARENT AND CHILD.**

### Assignment of Error No. II

**CLEAR AND CONVINCING EVIDENCE DID NOT EXIST TO JUSTIFY A FINDING THAT IT WAS IN THE BEST INTEREST OF THE MINOR CHILD TO TERMINATE PARENTAL RIGHTS AND AWARD PERMANENT CUSTODY OF THE MINOR CHILD TO CRAWFORD COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES.**

{¶27} Due to the nature of Brittany's assignments of error, we elect to address them out of order.

### Assignment of Error No. II

{¶28} In her second assignment of error, Brittany argues that the trial court's decision to grant permanent custody of A.J. to CCDJFS was not supported by clear and convincing evidence. Specifically, Brittany argues that her parental rights were improperly terminated insofar as A.J. could have been placed with Schultow or Jodi. We disagree.

---

[2] Schultow did not file a notice of appeal in this case and is not an appellant herein. Brittany's assignments of error rest on the premise that her parental rights should not have been terminated insofar as A.J. could have been placed with either Schultow or Jodi.

**{¶29}** Initially, we note that "the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). These rights, however, are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5–03–08, 2003–Ohio–5885, ¶ 7, citing *Murray* at 157. Parental rights "are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

**{¶30}** After a child has been adjudicated neglected and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody under R.C. 2151.415(A)(4). *In re Esparza*, 3d Dist. Marion Nos. 9–06–25, 9–06–27, 2007–Ohio–113, ¶ 25. Under R.C. 2151.414(B)(1), before a court can terminate parental rights and award permanent custody to an agency of the state, it must find that (1) the grant of permanent custody to the agency is in the best interest of the child, and (2) any of the following apply:

> (a) The child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

\* \* \*

**{¶31}** In determining whether a grant of permanent custody is in the best interest of the child, R.C. 2151.414(D)(1) sets forth a non-exhaustive list of factors for the court to consider. These factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

* * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

* * *.

R.C. 2151.414(D)(1)(a)-(b), (d).

**{¶32}** After it has been determined that a grant of permanent custody is in the best interest of the child, the court must determine whether "the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." In making this determination, R.C. 2151.414(E) provides the following instruction:

If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home;

-12-

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

(16) Any other factor the court considers relevant.

(Emphasis added.) In other words, "the trial court only needs to find one of the factors listed in (E) as to each parent before it 'shall' render a finding that a child cannot be placed with either parent." *In re Matthews*, 3d Dist. Marion Nos. 9–07–28, 9–07–29, 9–07–34, 2008–Ohio–276, ¶ 26, quoting R.C. 2151.414(E).

**{¶33}** A permanent custody determination generally must be supported by clear and convincing evidence. *In re Hiatt*, 86 Ohio App.3d 716, 725 (4th Dist.1993).

**{¶34}** Clear and convincing evidence is

[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). When "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence

before it to satisfy the requisite degree of proof." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). In other words, "the decision of a trier of fact relating to a motion for permanent custody of children will not be overturned, so long as the record contains competent credible evidence from which the trial court could have formed a firm belief or conviction that the essential statutory elements have been established." *In re Robinson*, 3d. Dist. Allen No. 1-08-24, 2008-Ohio-5311, ¶ 13.

**{¶35}** First, we consider whether the trial court's finding that it was in A.J.'s best interest to grant permanent custody to CCDJFS was supported by competent, credible evidence.

**{¶36}** Again, in making a best-interest finding, R.C. 2151.414(D)(1) provides a non-exhaustive list of factors to consider. These factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

\* \* \*

(d) The child's need for a legally secure permanent placement and whether that that type of placement can be achieved without a grant of permanent custody to the agency;

\* \* \*

R.C. 2151.414(D)(1)(a)-(b), (d).

**{¶37}** Here, the trial court relied on the above-mentioned factors in finding that it would be in A.J.'s best interest to grant permanent custody to CCDJFS. In its entry, the trial court stated that

> The record should reflect that the court took judicial notice that the written report of the Guardian Ad Litem, as required by O.R.C. Sec. 2151.414(C) was officially filed of record before the hearing and was taken into consideration in this decision.
>
> * * *
>
> There was testimony presented as to the evaluation of other family members or relatives for consideration of long-term alternative placement. Although requested, there were no names or information of any paternal family members or relatives provided to the agency for home-study evaluation. [Shari] has had previous involvement with neglect and dependency adjudication of her own children which would disqualify her from consideration. [Joanna] was found to have inadequate living space, a registered sex offender residing upstairs and during a previous child-welfare proceeding placement asked for the child to be removed from her custody due to her health and various personal problems. [Jodi] was found to have a previous child-welfare case in Richland County, a previous child endangering charge from 2002 and not employed at the time of the inquiry.
>
> * * *
>
> [Schultow] does not appear to be motivated or committed to completing the things necessary to be considered for placement of this child and that there is no true interpersonal parent-child relationship in existence. That it would be in the best interest of [A.J.] to provide her with a stable nurturing environment from another home and family.

(Docket No. 44, p. 7).

{¶38} It is clear that there was no interaction or interrelationship between Schultow and A.J. At the time of the permanent custody hearing, Schultow had never met A.J.; the only caregivers in A.J.'s life were her foster parents who she knew "as her parents." (Docket No. 43, p. 2). For these reasons, A.J.'s guardian ad litem recommended that permanent custody be granted to CCDJFS.

{¶39} In her brief, Brittany argues that permanency could have been achieved by placing A.J. with Jodi. Specifically, Brittany argues that CCDJFS did not investigate whether Jodi's prior charge of child endangering adversely impacted her ability to care for A.J. In response, CCDJFS argues that because Jodi was *convicted* of child endangering, she could not be approved as a relative caregiver pursuant to Ohio Adm.Code 5101:2-42-18(I).

{¶40} In considering whether a relative can be approved as a minor child's caregiver, a children services agency is guided by the requirements set forth in Ohio Adm.Code 5101:2-42-18. Under this section, a minor child generally cannot be placed in a home where any of its adult occupants have been "*convicted of or pleaded guilty to*" certain enumerated offenses, including child endangerment. (Emphasis added.) Ohio Adm.Code 5101:2-42-18(I). Additionally, where the victim of the offense is under the age of 18, the relative is barred indefinitely.

{¶41} Here, Bauer testified that Jodi was *charged* with child endangering in January 2002 and that her case was "ultimately closed"; however, the record is

silent as to whether Jodi was convicted of, or pleaded guilty to, the offense. May 26, 2015 Hrg., p. 22.

**{¶42}** Nonetheless, Bauer testified that Jodi's *charge* of child endangerment, as well as her lack of income, formed the basis for Jodi's rejection as a relative caregiver. Although we cannot say that Jodi was automatically excluded by application of Ohio Adm.Code 5101:2-42-18(I), Bauer's testimony established an appropriate basis for rejecting Jodi as a relative caregiver.

**{¶43}** With no available relative caregivers, nine-month-old A.J.'s need for permanency could only be achieved through CCDJFS or Schultow, and at the time of the permanent custody hearing, Schultow's whereabouts were unknown.

**{¶44}** Based on the foregoing, we find that there was competent, credible evidence to support the trial court's finding that it was in A.J.'s best interest to grant permanent custody to CCDJFS.

**{¶45}** Next, we consider whether there was competent, credible evidence to establish that A.J. could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414.

**{¶46}** Again, in making this determination, R.C. 2151.414(E) provides that

[i]f the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

* * *

(16) Any other factor the court considers relevant.

(Emphasis added.)

**{¶47}** Pursuant to R.C. 2151.414(E)(4), the trial court found that Schultow demonstrated a lack of commitment toward A.J. As noted above, at the time of the hearing, Schultow had never met A.J., despite the fact that his case plan allowed and encouraged supervised visits. Although visits with A.J. were scheduled, Schultow never attended.

**{¶48}** Similarly, although given both written and verbal notice, Schultow did not attend the permanent custody hearing (or any other custody-related

proceeding) or offer an explanation as to his absence. Again, at the time of the permanent custody hearing, Schultow's whereabouts were unknown.

**{¶49}** In her brief, Brittany argues that Schultow's limited financial resources prevented him from traveling to Ohio to visit with A.J. and attend custody-related proceedings. However, Brittany's argument is purely speculative; the record is devoid of any indication that Schultow cited a lack of funds as a reason for not attending visits with A.J. or custody-related court proceedings. For example, in its entry adjudicating A.J. a neglected child, the trial court noted that "the reputed father likewise failed to appear due to a tooth abscess." (Docket No. 12, p. 2). Notably, even if Brittany's claim were true, there was nothing preventing Schultow from demonstrating a commitment to A.J. from Pennsylvania. *See In re Willis*, 3d Allen No. 1-02-17, 2002-Ohio-4942, ¶ 30 (recognizing active involvement where father continually wrote letters to child's foster parents and the children services agency inquiring as to child's well-being and the progression of the child-custody case).

**{¶50}** With regard to the number of factors required to be found under R.C. 2151.414(E), "the trial court only needs to find one of the factors listed in (E) as to each parent before it 'shall' render a finding that a child cannot be placed with either parent." *In re Matthews*, 2008–Ohio–276 at ¶ 26, quoting R.C. 2151.414(E). Based on the foregoing, we find that there is competent, credible

evidence that Schultow demonstrated a lack of commitment toward A.J. pursuant to R.C. 2151.414(E)(4), and therefore, the trial court properly concluded that A.J. could not or should not be placed with Schultow.

{¶51} Accordingly, we overrule Brittany's second assignment of error.

*Assignment of Error No. I*

{¶52} In her first assignment of error, Brittany argues that CCDJFS failed to make a good faith effort to reunify Schultow and A.J. We disagree.

{¶53} There are two instances in which the Revised Code imposes a duty on the part of a children services agency to make reasonable efforts to reunite a parent with their child where the agency has removed the child from the home. *See* R.C. 2151.419(A)(1); 2151.414(E)(1). Neither instance applies in this case.

{¶54} First, R.C. 2151.419(A)(1) provides that

at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home the court shall determine whether the public children services agency * * * has made *reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home*.

(Emphasis added.)

{¶55} Here, the permanent custody hearing was not held pursuant to any of the enumerated sections in R.C. 2151.419(A)(1). Instead, the permanent custody

hearing was held pursuant to R.C. 2151.414 based on a motion made under R.C. 2151.413(A). By its plain terms, R.C. 2151.419(A) does not apply. *In re Bradley*, 3d Dist. Allen No. 1-05-56, 2006-Ohio-2367, ¶ 62; *In re Samples*, 7th Dist. Jefferson, No. 05 JE 39, 2006-Ohio-1056, ¶ 75 ("[W]e hereby hold that R.C. 2151.419(A)'s requirement of reasonable efforts to reunify is not applicable to orders granting permanent custody upon motions filed under R.C. 2151.413."); *In re S.S.*, 10th Dist. Franklin No. 05AP-204, 2005-Ohio-4282, ¶ 16-17 ("[B]ecause R.C. 2151.419 does not apply to R.C. 2151.413 or to hearings held pursuant to R.C. 2151.414, the 'reasonable efforts' requirement of R.C. 2151.419(A) is inapposite to the facts and circumstances of this case.").

{¶56} Second, R.C. 2151.414(E)(1) requires a finding that the minor child could not or should not be placed with a parent when

> Following the placement of the child outside the child's home and *notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home*, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(Emphasis added.)

{¶57} In its entry, the trial court made a finding under R.C. 2151.414(E)(1), which necessarily required that CCDJFS have made "diligent efforts" towards reunification. However, whether CCDJFS made diligent efforts towards reunification pursuant to R.C. 2151.414(E)(4) is immaterial because there was

-21-

competent, credible evidence supporting the trial court's determination under R.C. 2151.414(E)(4). *See, e.g.*, *In re Bradley* at ¶ 59. Again, "the trial court only needs to find one of the factors listed in (E) as to each parent before it 'shall' render a finding that a child cannot be placed with either parent." *In re Matthews*, 2008–Ohio–276 at ¶ 26, quoting R.C. 2151.414(E). Because the trial court's finding under R.C. 2151.414(E)(4) was appropriate, we need not consider whether CCDJFS complied with R.C. 2151.414(E)(1) and its diligent efforts requirement.

{¶58} Accordingly, we overrule Brittany's first assignment of error.

{¶59} Having found no error prejudicial to Brittany, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**